255 P.3d 774 (2011)
161 Wash.App. 654
STATE of Washington, Respondent,
v.
Nicholas Louis NOTARO, Appellant.
No. 39106-6-II.
Court of Appeals of Washington, Division 2.
May 6, 2011.
*775 Lise Ellner, Attorney at Law, Vashon, WA, for Appellant.
Kathleen Proctor, Pierce County Prosecuting Atty. Ofc, Tacoma, WA, for Respondent.
QUINN-BRINTNALL, J.
¶ 1 In 2009, a jury found Nicholas Notaro guilty of premeditated first degree murder, while armed with a firearm, for the murder of Joseph Tarricone. According to Notaro's admissions to a former co-worker and his 2008 confession to Pierce County Sheriff's detectives, Notaro killed Tarricone in 1978. When Tarricone visited Renee Curtiss, Notaro's sister, Notaro lured him into the basement of his (Notaro's) mother's Puyallup Canyon Road residence on the pretext of repairing a washing machine. Once in the basement, Notaro shot Tarricone twice in the back of the head. Curtiss, Notaro, and their mother then acquired a chainsaw, dismembered Tarricone's body, and buried it in the yard. In 2007, a construction company preparing to build a shopping center on the Canyon Road property discovered the human remains.
¶ 2 Notaro, who exercised his right not to testify at trial, appeals his conviction. He argues that (1) the trial court committed *776 reversible error when it allowed police to testify about statements that he made during a 2008 interview and (2) insufficient evidence supports the jury's premeditation finding. We disagree and affirm.

FACTS
¶ 3 Sometime during the summer or fall of 1978, all contact between Tarricone and his family abruptly ceased. At that time, Tarricone was dating Curtiss, who lived with her mother, Geraldine Hesse, on Canyon Road in Puyallup, Washington. Tarricone's daughter, Gina Chavez, filed a formal missing persons report with the Des Moines Police Department in 1979.
¶ 4 On June 4, 2007, a Sunrise Excavation employee uncovered skeletal human remains while excavating the land at the Canyon Road property where Hesse and Curtiss had lived. The Federal Bureau of Investigation (FBI) attempted to identify the human remains by comparing their mitochondrial deoxyribonucleic acid (DNA) with Tarricone's sister's mitochondrial DNA. Although the FBI could not identify the human remains definitively as Tarricone's, it also could not rule out that the remains were Tarricone's.[1] Subsequent investigations led the police to believe the remains were Tarricone's and that Curtiss and her family were involved with his disappearance and murder.
¶ 5 On March 25, 2008, the State charged Notaro with first degree murder under former RCW 9A.32.030(1)(a) (1976). At a CrR 3.5 hearing, Notaro argued that statements he made to detectives during a custodial interrogation should be suppressed because he made them without knowingly, voluntarily, and intelligently waiving his right against self-incrimination. Specifically, Notaro claimed that Detective Sergeants Denny Wood and Ben Benson[2] used deceptive interrogation tactics to induce statements from him. The trial court determined that nothing the detectives did overcame the voluntariness of Notaro's statements and that turning off a tape recorder during the interview was not improper or coercive. The trial court ruled that the detectives' testimonies about Notaro's statements made during both the taped and untaped portions of the police interview would be admissible at trial.
¶ 6 Notaro's jury trial began on February 12, 2009. The State presented 31 different witnesses, including Detectives Benson and Wood who testified about their interview with Notaro and statements that he made to them. Notaro chose not to testify at trial.
¶ 7 Detectives Wood and Benson testified that they interviewed Notaro on March 24, 2008. The detectives read Notaro his Miranda[3] rights, but they did not initially tell Notaro the reasons for the interview. Except for a few minutes at the beginning of the interview, Notaro's initial statement was tape recorded. During this taped part of the interview, Notaro said that in the late 1970s he traveled to Seattle for a few days after being released from the hospital following an appendectomy. Notaro also discussed moving to Seattle in 1989, and working at Winchell's Donuts in Puyallup. He acknowledged a friendship with a Winchell's co-worker, Arlene Tribbett.
¶ 8 The detectives testified that, after a break, they resumed interviewing Notaro, but they did not continue taping his statement because he seemed "very nervous" with *777 the tape recorder on. 4 Report of Proceedings (RP) at 478. At this point, the detectives told Notaro that they were investigating Tarricone's death and about the human remains discovered at the Canyon Road property where his mother and Curtiss were living at the time Tarricone disappeared. Notaro denied that either of his sisters were involved in the murder and said that his mother (who had since died) killed Tarricone and placed his body in a freezer because Tarricone would not leave Curtiss alone. Notaro said he bought a chainsaw at K-mart and dismembered the body in the basement, giving the head to his mother to dispose of separately. Notaro said he cut up the body because it made the body easier to carry upstairs to bury in the yard.
¶ 9 At trial, the detectives testified that they told Notaro his story was not credible and that mothers call their sons to deal with problems, they do not shoot people themselves.[4] According to the detectives, Notaro then changed his story. He told the detectives that his mother had called him about Tarricone harassing Curtiss. When Tarricone came to the house, Notaro asked Tarricone for help with the washing machine in the basement. Notaro told the detectives that he followed Tarricone into the basement, shot him in the back of the head twice, and then went to K-mart and bought a chainsaw to cut up the body. Notaro denied his sisters' involvement in the cover-up of the slaying, saying that only his mother held a tarp while he dismembered the body.
¶ 10 According to Detective Wood, Notaro also stated that he found the gun he used to kill Tarricone inside the Canyon Road house. But Alaska State Trooper Gary Tellep testified that on September 21, 1978, when he worked part-time in the sporting goods department at a Fairbanks JC Penney, he sold Notaro a Smith & Wesson revolver.
¶ 11 Carol Barnett, director of medical records at Alaska's Fairbanks Memorial Hospital, testified that hospital records showed that Notaro was admitted for an appendectomy on September 18, 1978, and discharged on September 21. Shirley Hamel, Notaro's employer at the time, testified that she saw Notaro in Alaska after his surgery on September 23. Notaro called Hamel on September 25, saying he had to go to Seattle and asked her to retrieve his car from the Fairbanks airport. Hamel next saw Notaro approximately one week later when she returned his car to him.
¶ 12 Tribbett, a co-worker of Notaro's at a Puyallup Winchell's Donut shop in the late 1980s, testified that when they worked together Notaro told her that in 1978, at his sister's request, he helped his sister kill her fiance. Tribbett testified that Notaro said he was in Alaska when his sister asked him to kill her fiance, that he flew from Alaska to Puyallup for the killing, and that he shot the man in the back of the head in the basement of a house off of Canyon Road. He also told Tribbett that he, his sister, and their mother used a chainsaw to cut off the man's arms and legs, put the body in a bag, and then buried the body under the porch. Tribbett testified that she initially did not call the police because she did not believe Notaro's bizarre story. But in 1994, Notaro talked with Tribbett again about the murder and told her that the man was buried at a house on Canyon Road under a porch. Tribbett then contacted Detective Jim Callaway of the Tacoma Police Department and reported Notaro's admissions. Detective Benson eventually contacted Tribbett in July of 2007, and took a tape-recorded statement from her.
¶ 13 At trial, Dr. Eric Kiesel, Pierce County's chief medical examiner, testified that the human bones discovered buried on the Canyon Road property had been cut up with a saw or chainsaw. Because only 48 bones and the upper occipital part of the skull were recovered, Kiesel could not confirm that the victim died from gunshot wounds to the back of the head. But he testified that there could be evidence of gunshot wounds in the missing lower occipital portion of the skull. Kiesel listed the official cause of death as "homicidal violence not specified." 3 RP at 313.
¶ 14 A jury found Notaro guilty of first degree murder and entered a special verdict *778 finding that Notaro used a firearm while committing the crime. Noting that the date of crime occurred before the Sentencing Reform Act of 1981, ch. 9.94A RCW, the trial court sentenced Notaro to life imprisonment, under former RCW 9A.32.040 (1975), followed by five years for the firearm enhancement, under former RCW 9.41.025 (1969). Notaro timely appeals.

ANALYSIS
¶ 15 Notaro asserts that the State violated his constitutional right to a jury trial by eliciting improper opinion testimony from Detective Wood about statements made in a police interview during which Notaro confessed to killing Tarricone. Specifically, Notaro challenges Wood's trial testimony that, during a police interview, he and Detective Benson told Notaro that they did not believe Notaro's initial story that his mother killed Tarricone and that he helped only to dismember and bury the body. Because Wood's trial testimony recounted statements made during an interrogation and is not opinion testimony, we discern no error.
¶ 16 We review a trial court's decision to admit or exclude a law enforcement officer's statements during an interrogation for an abuse of discretion. State v. Demery, 144 Wash.2d 753, 758, 30 P.3d 1278 (2001) (plurality opinion); see State v. Darden, 145 Wash.2d 612, 619, 41 P.3d 1189 (2002). A witness may not offer testimony in the form of an opinion regarding the guilt or veracity of the defendant. Demery, 144 Wash.2d at 759, 30 P.3d 1278 (plurality opinion); City of Seattle v. Heatley, 70 Wash.App. 573, 577, 854 P.2d 658 (1993), review denied, 123 Wash.2d 1011, 869 P.2d 1085 (1994). Such testimony is irrelevant and invades the defendant's right to a jury trial and invades the jury's exclusive fact-finding province. State v. Kirkman, 159 Wash.2d 918, 927, 155 P.3d 125 (2007); Demery, 144 Wash.2d at 759, 30 P.3d 1278 (plurality opinion); State v. Dolan, 118 Wash.App. 323, 329, 73 P.3d 1011 (2003). Particularly where an opinion on the veracity of a defendant is expressed by a government official, such as a sheriff or a police officer, the opinion may influence the fact-finder and deny the defendant of a fair and impartial trial. Dolan, 118 Wash.App. at 329, 73 P.3d 1011.
¶ 17 In determining whether a statement constitutes improper opinion testimony, we consider the type of witness involved, the specific nature of the testimony, the nature of the charges, the type of defense, and the other evidence before the trier of fact. State v. Montgomery, 163 Wash.2d 577, 591, 183 P.3d 267 (2008) (quoting Demery, 144 Wash.2d at 759, 30 P.3d 1278). "[T]estimony that is not a direct comment on the defendant's guilt or on the veracity of a witness, is otherwise helpful to the jury, and is based on inferences from the evidence is not improper opinion testimony." City of Seattle, 70 Wash.App. at 578, 854 P.2d 658.
¶ 18 At trial, Detective Wood testified about his interview with Notaro as follows:
[STATE] Was there discussion about whether or not [Notaro] knew what had happened to this "Joe" [Tarricone]?
[WOOD] There was.
[STATE] What did he say?
[WOOD] I believe that he had either heard or thought he had gone to Italy.
[STATE] Was [Notaro] asked whether or not he saw this "Joe" again in Alaska?
[WOOD] He was.
[STATE] What did he say?
[WOOD] He said he did not.
[STATE] And was he asked[Notaro] asked whether or not he hung out with this "Joe" socially?
[WOOD] Yes, ma'am.
[STATE] What did he say?
[WOOD] Again, [Notaro] said he did not hang out with [Tarricone].
[STATE] Was he asked whether he saw [Tarricone] in the Seattle area with his sister, [Curtiss]?
[WOOD] He was.
[STATE] What did [Notaro] state?
[WOOD] He said he did not see him down here with her.
[STATE] You testified that you took a second break at 11:43 hours, correct?
[WOOD] Yes, ma'am.

*779 [STATE] When you returned at 11:53 hours, was the tape recorder turned back on?
[WOOD] It was not. My assumption, at the time, was because Mr. Notaro was very nervous with it, kept looking at it during certain portions of the interview, certain questions he would stare directly at it, almost back up at certain times. It appeared to make him uncomfortable.
[STATE] At 11:53 hours, was [Notaro] told that you and Detective Benson were investigating the death of Joseph Tarricone and discovery of human remains at Mr. Notaro's family's property at Canyon Road?
[WOOD] Yes, ma'am.
[STATE] And upon explaining this to [Notaro], describe for the jury [Notaro's] demeanor.
[WOOD] Initiallythe demeanor. He was just looking at [the tape recorder], then he sat up again, pulled his shoulders back, and looked at Detective Benson and said . . . "My sisters were not involved. Not one iota."
[STATE] What did [Notaro] tell you regarding the death of Joseph Tarricone?
[WOOD] He initially told us that his mother had killed [Tarricone]. When [Notaro] came down [from Alaska], she told [Notaro] she had killed [Tarricone]; took [Tarricone] downstairs, told him the washing machine was broke, and when he bent over to look inside the washing machine, the mother had shot him in the back of the head and put him inside of a freezer. [Notaro] said that when he went down [to the basement], [Tarricone] was in the freezer.
[STATE] Did [Notaro] tell you why his mother supposedly had shot [Tarricone?]
[WOOD] He did. He said that [Curtiss] was having problems with Joseph Tarricone, he wouldn't leave [Curtiss] alone, and [his mother] shot [Tarricone].
[STATE] And you indicate [Notaro] told you, initially, that his mother put the body in a freezer?
[WOOD] Yes, ma'am.
[STATE] Did [Notaro] describe what kind of freezer?
[WOOD] He did. I asked him what kind of freezer it was, and he held his arms out real wide and he said it was a chest-style freezer.
[STATE] Did he say, when he saw the body in the freezer, what action he took?
[WOOD] He pulled the body from the freezer.
[STATE] Did he tell you what he did with the body once he pulled it from the freezer?
[WOOD] He did. He went to Kmart, bought a chain saw and tarp, then dismembered the body, cut it up in the basement, and his mother.[sic]
[STATE] Did he indicate who held the tarp, who used the chain saw?
[WOOD] Yes, ma'am. He said his mother held the tarp while he cut the body up.
[STATE] Did he indicate what he did with the body once he chopped up the body?
[WOOD] He did. He said he gave the head to his mother to get rid of separately, and he took the remaining itemslegs, torso, armsput them in two bags and took them to the yard to bury them.
[STATE] You indicate that he told you he pulled the entire body out of this big chested freezer?
[WOOD] Yes, ma'am.
[STATE] When he told you this, did you follow up with any additional questions?
[WOOD] I did. I asked him about cutting the body up; asked him why he cut it up.
[STATE] And what did he respond?
[WOOD] It was easier to carry upstairs and to bury.
[STATE] When he gave this explanation as to the reason why he cut up the body, how did you respond to him?
[WOOD] I told him I didn't believe him.
[DEFENSE]: Objection, Your Honor. Move to strike. Like to be heard outside the presence of the jury.

*780 THE COURT: I'm going to sustain the objection and ask you to move on.
. . . .
[STATE] Based upon [Notaro's] statement that he assisted his mother in chopping up the body, did he change hishis story?
[WOOD] Yes, ma'am, he did.
[STATE] And what did you say to him to have him change his story?
[WOOD] I leaned forward, and I told him I didn't believe him.
[DEFENSE]: Again, objection, Your Honor. Demery.

THE COURT: I'm going to overrule. Go ahead.
[WOOD] I told him I didn't believe him. I said, I don't believe your mother was able to put [Tarricone's] body in a freezer by herself if he had such a difficult time pulling it out and taking it upstairs to bury it.
[DEFENSE]: Your Honor, I object. I'd like to be heard outside the presence of the jury.
THE COURT: We'll make a record later. Thank you.
[WOOD] I told him I didn't believe that that's what mothers did when they have a problem such as the problems [sic] they were having. They called their sons, and sons dealt with the problems. Mothers didn't shoot people.
. . . .
[STATE] What was [Notaro's] demeanor as you questioned him regarding his mother being the shooter?
[WOOD] He was looking at me, making eye contact, and he was nodding his head up and down.
[STATE] And when he was nodding his head up and down, what did you ask him next?
[WOOD] I told him to tell me the truth. Tell me the story of what happened.
[DEFENSE]: Objection, Your Honor.
THE COURT: Overruled. Go ahead.
. . . .
[STATE] And did [Notaro] respond?
[WOOD] Yes he did.
[STATE] And what did he tell you happened?
[WOOD] He told me that his mother had called him, told him about the problem. He went down to his mother's house, and Joseph Tarricone came over to the house. [Notaro] asked [Tarricone] to go downstairs and look at the washing machine; told [Tarricone] there was a problem. When [Notaro] and Mr. Tarricone got downstairs, [Notaro] said he shot [Tarricone] in the back of the head.
I asked [Notaro] if he shot [Tarricone] once, and [Notaro] said he shot [Tarricone] twice. [Notaro] said after they shot [Tarricone], he explained that he went to the Kmart, bought a chain saw and tarp, and returned to the house where they dismembered the body, cut up the body downstairs.
[STATE] And did [Notaro] specifically statehe said where he cut up the body?
[WOOD] Yes, ma'am, downstairs by theor in the basement.
[STATE] And did [Notaro] indicate where or what gun he used to kill Joseph Tarricone?
[WOOD] He said he got a gun from inside the house.
[STATE] Did [Notaro] tell you how he got to Kmart to purchase the chain saw?
[WOOD] He didn't remember. I asked him who took them; he said he didn't remember.
[STATE] And did he indicate what his mother did while he dismembered the body?
[WOOD] Again, he said she held the tarp up while he dismembered the body with the chain saw.
[STATE] Did [Notaro] indicate what parts of the body he dismembered?
[WOOD] Yes, he did.
[STATE] What did he say?
[WOOD] He said he cut off his arms, his legs, and his head.
[STATE] Did [Notaro] explain why he killed Joseph Tarricone?

*781 [WOOD] Yes.
[STATE] What did he say?
[WOOD] He said Joseph Tarricone kept bothering his sister, [Curtiss], and she said [Tarricone] asked her repeatedly to marry him, and she said no. [Tarricone] wouldn't take no for an answer. [Tarricone] was constantly trying to get [Curtiss] into bed and wouldn't leave her alone, so he [Notaro] went down and took care of it.
[STATE] And did [Notaro] indicate to you when he had determined to kill Joseph Tarricone? Was it when he got to Seattle or was it when he was in Alaska?
[WOOD] I don't recall.
[STATE] Was [Notaro] asked whether anyone asked him to kill Joseph Tarricone?
[WOOD] He was asked that.
[STATE] What was his response?
[WOOD] He said that nobody needed to tell him to kill [Tarricone].
[STATE] Is that a direct quote?
[WOOD] No, ma'am.
. . . .
His direct quote was, "Nobody had to tell me to kill him."
[STATE] Did [Notaro] indicate who helped him carry the body parts to the yard?
[WOOD] Yes, ma'am, his mother.
[STATE] And did he indicate how many holes in the yard were dug to bury the body parts?
[WOOD] He said two.
[STATE] And did he indicate why he cut up Joseph Tarricone in the basement?
[WOOD] Yes, ma'am, he did.
[STATE] What did he say?
[WOOD] He said it was to make it easier to carry [Tarricone] upstairs and to bury him.
[STATE] Did [Notaro] indicate what happened to the gun and chain saw?
[WOOD] He didn't know what happened to it.
4 RP at 477-86.
¶ 19 In Demery, our Supreme Court addressed whether statements made by police officers during a taped interview where they accused the suspect of lying constituted impermissible opinion testimony. 144 Wash.2d at 754, 30 P.3d 1278 (plurality opinion). In Demery, the trial court admitted the tape and transcript of the police interview, without redacting the police officers' accusations, because including the police statements were necessary to provide context to the defendant's responses. 144 Wash.2d at 756-57, 30 P.3d 1278 (plurality opinion). We granted the defendant a new trial after determining that the police accusations of lying were impermissible opinion testimony of Demery's veracity. State v. Demery, 100 Wash.App. 416, 997 P.2d 432 (2000), rev'd, 144 Wash.2d 753, 30 P.3d 1278 (plurality opinion). A plurality of our Supreme Court agreed with the Ninth Circuit analysis in Dubria[5] that an officer's trial testimony about statements made during a pretrial interview are not the types of statements that carry a special aura of reliability, and concluded that such statements are interrogation tactics and not opinion testimony. Demery, 144 Wash.2d at 763-65, 30 P.3d 1278. Accordingly, the Supreme Court reversed our opinion and affirmed Demery's conviction. Demery, 144 Wash.2d at 755, 30 P.3d 1278.
¶ 20 In an opinion concurring only in the result, Justice Alexander limited his analysis to a nonconstitutional error analysis, that there is no error unless prejudice exists, because of how the parties presented issues in their briefs. Demery, 144 Wash.2d at 765-66, 30 P.3d 1278 (Alexander, C.J. concurring). Justice Alexander concluded that refusing to redact the officer's statement did not prejudice Demery because there was no reasonable probability that redacting the detective's interrogation statements, specifically those relating to the credibility of the defendant's account of the crime, would have changed the jury's verdict. Demery, 144 *782 Wash.2d at 766, 30 P.3d 1278 (Alexander, C.J., concurring). Moreover, Justice Alexander noted that the police accusation contained during the pretrial interview was not a significant part of the State's case. Demery, 144 Wash.2d at 766, 30 P.3d 1278 (Alexander, C.J., concurring).
¶ 21 The facts in the present case mirror those in Demery. Here, Detective Wood's trial testimony described the police interrogation strategy and helped explain to the jury why Notaro changed some parts of his storybut not othershalfway through the interview. Wood's statements during the interrogation were designed to see whether Notaro would change his story. Such trial testimony is an account of tactical interrogation statements designed to challenge the defendant's initial story and elicit responses that are capable of being refuted or corroborated by other evidence or accounts of the event discussed. And, as stated in Demery, statements made during a pretrial interview are not the types of statements that carry a special aura of reliability usurping the province of the jury at trial. 144 Wash.2d at 763-65, 30 P.3d 1278. Accordingly, taken in context, Wood did not testify at trial about his personal beliefs; instead, he recounted the full version of each participant's statements during Notaro's interrogations.[6]
¶ 22 Moreover, we note that Detective Wood's full trial testimony about his tactical interrogation statements adequately informed the jury that he was not expressing his personal belief of Notaro's veracity. At trial, Wood said, "I told [Notaro] I didn't believe him. I said, I don't believe your mother was able to put [Tarricone's] body in a freezer by herself if [Notaro] had such a difficult time pulling it out and taking it upstairs to bury it." 4 RP at 481. This statement is functionally equivalent to "Notaro, your story does not make any sense. How could your mother be strong enough to put a full grown man into a freezer by herself if he was so big that you had a difficult time pulling him out and taking him upstairs to bury," or "your story is inconsistent with the evidence that shows . . ., can you explain this contradiction."
¶ 23 In addition, we believe that Notaro waived his challenge to Detective Wood's testimony. During cross-examination, Notaro asked Wood, "And by saying you didn't believe [Notaro], [that] related back to that statement that [his] sisters were involved, correct?" 4 RP at 502. Wood answered, "Did it relate back to that?. . . . I just didn't believe the story, ma'am, about his mother." 4 RP at 502. To the extent Wood's response during cross-examination revealed his personal opinion about Notaro's veracity, Notaro elicited this testimony. Accordingly, Notaro waived any challenge to Wood's opinion testimony to the extent he elicited Wood's opinion.
¶ 24 Finally, applying Justice Alexander's harmless error analysis in Demery, even if we assume that Detective Wood's trial testimony constituted opinion testimony, we discern no prejudicial error. In light of Notaro's (1) full confession during the police interrogation, (2) admissions to Tribbett, and (3) gun purchase and visit to Washington State that correlated with (a) dates in his confessions and (b) the last communications between Tarricone and his family, there is not a reasonable probability that the jury's verdict would have changed had the trial court excluded Wood's detailed statements describing the police interrogation. See Demery, 144 Wash.2d at 766, 30 P.3d 1278 (Alexander, C.J., concurring).

SUFFICIENCY OF EVIDENCE
¶ 25 Next, Notaro contends that the evidence was insufficient to prove Tarricone's murder was premeditated. We disagree.
¶ 26 Evidence is sufficient to support a conviction if, viewed in the light most favorable to the jury's verdict, it permits any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. State v. Salinas, 119 Wash.2d 192, 201, 829 P.2d 1068 (1992). A claim of insufficiency admits the truth of the State's evidence and all reasonable inferences that a *783 trier of fact can be drawn from that evidence. Salinas, 119 Wash.2d at 201, 829 P.2d 1068. All reasonable inferences from the evidence must be drawn in favor of the verdict and interpreted strongly against the defendant. Salinas, 119 Wash.2d at 201, 829 P.2d 1068. Circumstantial evidence is no less reliable than direct evidence, and "specific criminal intent of the accused may be inferred from the conduct where it is plainly indicated as a matter of logical probability." State v. Delmarter, 94 Wash.2d 634, 638, 618 P.2d 99 (1980).
¶ 27 The trier of fact is the sole and exclusive judge of the evidence. State v. Bencivenga, 137 Wash.2d 703, 709, 974 P.2d 832 (1999). Our role as the reviewing court is not to reweigh the evidence and substitute our judgment for that of the jury. State v. Green, 94 Wash.2d 216, 221, 616 P.2d 628 (1980). Instead, we defer to the trier of fact's resolution of conflicting testimony, evaluation of witness credibility, and decisions regarding the persuasiveness of evidence. State v. Camarillo, 115 Wash.2d 60, 71, 794 P.2d 850 (1990); State v. Walton, 64 Wash.App. 410, 415-16, 824 P.2d 533, review denied, 119 Wash.2d 1011, 833 P.2d 386 (1992).
¶ 28 Here, the State charged Notaro with premeditated first degree murder, a violation of former RCW 9A.32.030(1)(a). To prove that Notaro committed premeditated first degree murder; the State was required to prove the following elements beyond a reasonable doubt:
(1) That on or about the period between the 21st day of September, 1978 and the 21st day of October, 1978, the defendant, or an accomplice, acted with intent to cause the death of Joseph Tarricone;
(2) That the intent to cause the death was premeditated;
(3) That Joseph Tarricone died as a result of the defendant's acts; and
(4) That any of these acts occurred in the State of Washington.
Clerk's Papers (CP) at 403.
¶ 29 The trial court's jury instructions defined premeditation as follows:
Premeditated means thought over beforehand. When a person, after any deliberation, forms an intent to take human life, the killing may follow immediately after the formation of the settled purpose and it will still be premeditated. Premeditation must involve more than a moment in point of time. The law requires some time, however long or short, in which a design to kill is deliberately formed.
CP at 402 (emphasis added).
¶ 30 The State's evidence amply proved Notaro's premeditation for Tarricone's murder and supports the jury's verdict. According to Notaro's statements to police, he lured Tarricone into the basement of the Canyon Road house on the pretext of fixing a washing machine and, once there, shot him twice in the back of the head. An inference of premeditation can be established by a range of proven facts, including procuring a weapon to facilitate the killing, striking the victim from behind, and inflicting multiple wounds or shots. State v. Ra, 144 Wash. App. 688, 703, 175 P.3d 609 (citing State v. Allen, 159 Wash.2d 1, 8, 147 P.3d 581 (2006); State v. Clark, 143 Wash.2d 731, 769, 24 P.3d 1006, cert. denied, 534 U.S. 1000, 122 S.Ct. 475, 151 L.Ed.2d 389 (2001); State v. Pirtle, 127 Wash.2d 628, 644-45, 904 P.2d 245 (1995), cert. denied, 518 U.S. 1026, 116, S.Ct. 2568, 135 L.Ed.2d 1084 (1996); State v. Hoffman, 116 Wash.2d 51, 83, 804 P.2d 577 (1991)), review denied, 164 Wash.2d 1016, 195 P.3d 88 (2008). Accordingly, the jury could reasonably infer from Notaro's own statements that he planned the murder because he (1) brought a gun with him into the basement when luring Tarricone there under false pretenses, (2) shot Tarricone in the back of the head, and (3) shot Tarricone multiple times.
¶ 31 In addition, Tribbett testified that Notaro told her that in 1978, when he lived in Alaska, Curtiss contacted him to help her kill her fiance and that he flew to Puyallup for the killing. And Alaska State Trooper Tellep testified that he sold Notaro a gun in late September 1978, on the same day that medical records showed Notaro was released from an Alaska hospital after an appendectomy. Hamel, Notaro's employer at the time, testified *784 that a few days after his surgery, Notaro called her to pick up his car from an airport because of a trip to Seattle, and that she returned Notaro's car to him a week later.
¶ 32 When viewed in the light most favorable to the jury's verdict, any reasonable jury could find beyond a reasonable doubt that Notaro planned Tarricone's killing and committed premeditated first degree murder while armed with a firearm. Accordingly, Notaro's challenge to the sufficiency of the evidence fails and we affirm his conviction.
We concur: WORSWICK, A.C.J., and WILLIAMS, J.P.T.
NOTES
[1] An FBI forensics expert testified extensively about the analysis of the human remains and why mitochondrial DNA was used instead of nuclear DNA. Although nuclear DNA's highly individualized code can often provide an exact identification of a body, it breaks down faster than mitochondrial DNA. But a disadvantage of analyzing mitochondrial DNA is that it cannot be used to determine the specific identity of a body. Mitochondrial DNA is always passed from mothers to their children, so analyzing it allows only for a determination of whether a relationship and/or common ancestry exists among tested individuals. Accordingly, the age of the bones limited the available forensics techniques. The FBI could not definitively identify the bones as Tarricone's, but it also could not exclude that the bones were Tarricone's.
[2] Both Denny Wood and Ben Benson are classified as "Detective Sergeants" at the Pierce County Sheriff's Office. In this opinion, we refer to both simply as "detectives" even though we recognize there is a difference between these two classifications at the Pierce County Sheriff's Office. We refer to the parties in this way for ease to the reader and mean no disrespect.
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[4] Although not presented to the jury during this trial, the interviewing detectives knew that Notaro had served prison time in Alaska for shooting and killing his wife in the 1970s.
[5] Dubria v. Smith, 224 F.3d 995, 1001-02 (9th Cir.2000), cert, denied, 531 U.S. 1148, 121 S.Ct. 1089, 148 L.Ed.2d 963 (2001).
[6] We note that the context of Detective Wood's statement would differ if Notaro had ended the interrogation by requesting to speak with his attorney, rather than changing his story.