

2014 JUL 28  A. 10: 10

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | NO. 72036-8-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| KELVIN KEON KERVILLE MARSHALL, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED:  July 28, 2014 |

LAU, J. — Kelvin Marshall appeals his first degree burglary conviction, arguing that (1) the trial court admitted improper opinion testimony recounting statements made by detectives who interviewed him after his arrest, (2) the prosecutor committed misconduct during closing arguments, (3) the sentencing court erroneously imposed certain community custody conditions, and (4) the sentencing court unlawfully ordered him to forfeit property.  Because (1) the challenged witness testimony expressed no personal beliefs on credibility, (2) the prosecutor committed no closing argument misconduct, and (3) his forfeiture claim is premature, we affirm his conviction.  But because the court imposed unlawful community custody conditions relating to controlled substances and sexually explicit materials, we remand with instructions to strike those conditions from the judgment and sentence.

## FACTS

The trial evidence established the following facts:  Twenty-eight-year-old Tasha Church lived in a small, second-floor apartment with her boyfriend, Eddie Sumlin.  On

the morning of September 2, 2011, 10 to 20 minutes after Sumlin left for work, Church answered a knock at the door from a man she did not know. The man said the apartment manager sent him to check the water pipes. The man put his hand on the door, entered the apartment, and walked to the bathroom. Church later identified the man from a photomontage as Marshall.

Marshall went into the kitchen. Church got suspicious because the kitchen pipes worked fine. She looked up and saw Marshall staring at her. Marshall walked slowly toward her and began stroking a wrench "suggestively." Report of Proceedings (RP) (Jan. 15, 2013) at 236. Marshall sat on the bed next to Church. He touched her hair, massaged her shoulder, and said, "[Y]ou look tense." RP (Jan. 15, 2013) at 235. Church told Marshall to stop. Marshall asked Church if she was happy with her boyfriend and if she would call him. Church said she was happy and would not call. Marshall touched Church's feet and told her they were very nice.

Church put her hand in the air and said, "You really need to stop." RP (Jan. 15, 2013) at 238. Marshall got up and walked to the bathroom. Church grabbed some belongings. As she fled the apartment, Church said, "He asked if my boyfriend goes down on me, because he would." RP (Jan. 15, 2013) at 240. Church "made a disgusted noise . . . ." RP (Jan. 15, 2013) at 240. Marshall asked Church if she was leaving. Visibly upset, Church responded, "[O]h yeah, I'm gone." RP (Jan. 15, 2013) at 240.

Church saw the apartment manager and his wife at the bottom of the stairs. She angrily asked the manager about the man he hired. The manager denied hiring anyone

-2-

and ran up the stairs. The manager's wife called 911. The manager later identified Marshall in a photomontage.

Shannon Glen lived in Church's apartment complex. She saw a man smoking outside the complex the night before the incident. Glen's friend asked the man what he was doing. The man responded, "I'm with maintenance." RP (Jan. 15, 2013) at 288. Glen described the man as a "[t]all, skinny, young, African American black guy with a red shirt on, short hair." RP (Jan. 15, 2013) at 289.

Scott Kidwell lived across the street from Church. On the morning of the incident, he saw a "clean cut black kid" park on the street. RP (Jan. 15, 2013) at 301. He said the kid walked behind Church's apartment and then returned to the street. The kid retrieved a "brand new crescent wrench" from his car, made a phone call, and then walked toward Church's apartment. RP (Jan. 15, 2013) at 301.

Tacoma Police Officer Pamela Rush responded to a 911 call reporting a burglary at Church's apartment. When Officer Rush arrived, Kidwell pointed out the car driven by the man with the crescent wrench. Officer Rush saw an envelope inside the car indicating Marshall was in the military. The next day, she arrested Marshall at a nearby military base.

Detectives Keith Miller and Brad Graham questioned Marshall at the police station shortly after his arrest. In a tape-recorded interview, which was later transcribed for trial, Marshall acknowledged parking on the street outside Church's apartment but claimed he left on foot after being grabbed by a stranger:

> This, um, like a black dude came out and stuff like that and when I (unintelligible) then it w—after, it's like this other white dude came like shorts, shorts and stuff, and he's like grabbing me and stuff. I was like, "Hey let me go, it's not me." And

-3-

that dude go, like, he's, like, still, like, grabbing me and stuff so I like wrench away and I ran- ran up to my house and stuff so I called my wife.

Ex. 23 at 11. He said he returned to the street but left when he saw police officers assembling in the area:

> So, from there, um, um, walk, look around to, like, get my car and when I walked back to get my car, it's like there's, uh, police car. So I—I called her back there and say, um, "I'm, like, walking and, like, there's a cop car," and she was like, "Alright, go home."

Ex. 23 at 11. Later during the interview, Marshall changed his story. He told detectives that he entered Church's apartment while pretending to be a plumber:

> So went, I was like, I don't know what to say so I was like, um, oh, I'm the plumber. So she was like, alright go ahead. So, she was like, uh, the bath—it was bathroom and stuff like that, so like they . . . and, like, and like, what's he doing now so . . . guess we, um, we started talking for a minute.

Ex. 23 at 28 (ellipses in original). He said that he and Church talked while sitting on Church's bed. He claimed that the two discussed music and that Church said she liked music. He said he left the apartment briefly to retrieve a music CD (compact disc) from his car. He said he and Church unsuccessfully attempted to play the CD on Church's laptop.

Marshall acknowledged, "And, like . . . then think, um, think I touched her, um, like, her, like, uh, here but not on her back, touched her hair and stuff and then she was like, Okay, um, then I say something about, he's a, um, uh, 'I like my boyfriend so,' um, 'I don't like cheating on him.'" Ex. 23 at 29. He claimed that he left the apartment complex shortly after this exchange. He said Church did not appear frightened. He denied that he visited the apartment complex the previous night.

At trial, Church testified she found an unfamiliar CD in her laptop when she returned to her apartment for the first time. She thought the CD might contain a virus, since it was labeled "Y2K." RP (Jan. 15, 2013) at 244. The court admitted the CD at trial. The parties stipulated that the CD contained Church's fingerprints but that neither the laptop nor the CD contained Marshall's fingerprints. Marshall did not testify at trial.

During closing arguments, defense counsel conceded that Marshall unlawfully entered Church's apartment and that, once inside, he assaulted Church. He disputed only that Marshall "entered with the intent at that point in time that he was going to commit a crime inside," and that "he [did] so for purposes of sexual gratification." RP (Jan. 17, 2013) at 471. He asked the jury to acquit Marshall of first degree burglary and to convict him instead on the lesser included charges of first degree criminal trespass and fourth degree assault. He also asked the jury to find that Marshall lacked sexual motivation when he committed these crimes.

A jury found Marshall guilty of first degree burglary committed with sexual motivation. Marshall appeals.

## ANALYSIS

### Opinion Testimony

Marshall contends the trial court erroneously admitted testimony that constituted an opinion on his credibility, veracity, or guilt. For the reasons discussed below, we hold that the court properly exercised its discretion when admitting the testimony.[1]

---

[1] Our record does not contain a verbatim transcript of the portion of trial during which the deputy prosecutors and Detective Miller read the interview transcript into the record. The trial court stated, "Since [the interview has] already been transcribed, [the

-5-

At trial, the court allowed the State to present portions of the transcript of Marshall's pretrial interview with Detectives Graham and Miller. Prosecutors read the lines spoken by Detective Miller and Detective Graham. Detective Miller read the defendant's statements.

As quoted above, Marshall first told the detectives that he drove to Church's street. But he claimed he left on foot after being grabbed by a stranger. He said he returned to retrieve his car but left when he saw police officers gathering in the area.

Detective Graham questioned Marshall's story:

Um, I—I want you to think long and hard. Lots and lots of people come into here and talk to us. And they say stuff that they think they need to say or they say stuff that we want to hear. Now, neither Detective Miller or I want you to say anything that's not true. I'm gonna want you to—we don't wanna put words in your mouth. But you also know that we didn't just happen upon you. Okay? We know that there was some more things that went on that day. We know that ya went a little bit further than in the street, and we know that, um, that you did talk to some other people and—and—and so, let me just say from the beginning that one of the things that we have to do is kinda sort out the lies. We kinda know the "whats" already but y—we actually do know where you were, and we do have people who can tell us where you went and people who did see you. So I mean that's not, uh, and—and unfortunately, because you do—you do speak with a very unique accent, you don't sound like you're from Tacoma, um, you're not that hard to identify. Okay? But what we have to look at here is more of the "what went on." We got one side of the story from her, and we don't think it's fair to go much further without getting the other side of the story from you. If something went on by force or if—if you just—if something was d—designed to hurt somebody, then that's a problem. But if something happened and it wasn't designed to hurt somebody and it was being—you know, misunderstanding or an accident or something along those lines, then we need to know that as well. And, again, neither one of us wants you to say anything that's not true, but also understand that when you're done in this room, you're done talking to us. And if you tell us that all you did was stay out out [sic] here on the street and you didn't go and talk to anybody, you didn't go into any building, and then later on we can prove, and we will prove, that that's not true, then you're gonna come out looking like a real bad guy. And you mighta had a good reason for going in and it might

court report] will not be making another transcription, so she is going to exit when you start the reading." RP (Jan. 16, 2013) at 365.

have been a—an innocent reason for going in. But when you stand up and you give that reason, and you talk to a lawyer and the lawyer says, "Hey, you gotta tell 'em what really happened, and that y—nothing bad went on," or the other person was okay or, or s—whatever it was, you're gonna say that and people are probably gonna believe you because you come across as a—a pretty honest-looking guy. But the problem is that he and I got to come in and go, "Yeah, but on September 2nd at 3:30 in the afternoon, we asked Kelvin that, and he said he didn't do any of that. So is he lying then or is he lying now?" You know what I mean? So, I want you to think back. We haven't written any reports yet so it's not too late to—to kinda fix things up here. But I don't think you're [sic] been telling us the—the complete truth, have you? There's—there was a little more to it, wasn't there? Trying to help you—we're trying to help you help yourself. We've got one side of the story, Kelvin, and it's not fair that we only have one side. Okay? And one of the things we're gonna get asked when we leave this room is, "Did he try to hurt somebody?" And I—I wanna be able to answer honestly. I wanna be able to say, "Wait, hey listen, this is what he said happened. This is maybe how it got out of hand and got out of control real quick." You know what I mean? If I just go out there and say, "Well, I mean, you know, basically we finished talking to him and he said he never left the street," and then we look at all of the other evidence we have including, you know, the witness and everything else, then that it—it kinda makes you look bad. And I—I don't think you need to look bad. I think you need to look honest here. So Kelvin, something more went on and the problem is you need to help yourself and the only way to help yourself is to kinda be honest with us. I can see that you're scared. You look scared, and I totally get that. I mean, hell, you're in a police station, cops are asking you questions. You got—you got, I understand that. You got a good reason to—to feel nervous and scared. But—but I—I'm telling you that—I'm tell [sic] you tha—that—that not being honest with us is not the way out of this thing. Okay? Don't—don't—it's like you're pushing a giant rock up a hill. You don't wanna be doin' it that way. You want to be in front of the rock not behind the rock. So, kinda, um, maybe you should start over again and you haven't been completely honest, have you?

Ex. 23 at 17-19. After a short break, Detective Graham resumed:

Det. Graham: So when we left off I told you that I don't—neither one of us thinks that you were being totally honest with us in the first go-around. Is that true? Do you want to tell us what really happened?

Marshall: Okay. So you, uh, already had the first part. You gonna, like, start over?

Det. Graham: Yeah, we can. Yeah.

Ex. 23 at 25. As quoted above, Marshall responded and acknowledged that he entered

Church's apartment while pretending to be a plumber.

Detective Miller told Marshall, "I think you wanted to go in there and have sex with somebody." Ex. 23 at 53. Marshall said, "That's not true." Ex. 23 at 53. Detective Miller confronted Marshall on this point:

Det. Miller: Kelvin, if I told you this story that you've told us about randomly picking this apartment and knocking on the door, happen to have a b—a tool bag and saying that you're the plumber, what would you think?

Marshall: I'd say something—something crazy with that story but . . .

Det. Miller: It does sound crazy.

Marshall: . . . that's why it happened, though. That's how it happened. Like, I was, uh, be honest, that's what happened.

Det. Miller: Kelvin, I—I—you know I—I appreciate that you told us, for the most part, I think you've told us the truth and I think you're—you're avoiding the reason why you were knocking on the door.

Ex. 23 at 54. Marshall continued to deny a sexual motivation. Detective Miller persisted:

Det. Miller: Well, Kelvin, again, I—I appreciate your honesty with us, but I still think you're—you're going around the issue of why you knocked on that door. You—you and I know, Detective Graham and I know and you know what your intent was.

. . .

Kelvin, this is your only opportunity to tell us the truth. Neither of us are going to come and talk to you again about this. This is it right here. And like Detective Graham told you earlier, you change your story later . . .

Marshall: I'm not . . .

Det. Miller: . . . an—and that's not gonna look good.

Ex. 23 at 59-61. Marshall contends the above-quoted statements by Detectives Graham and Miller constituted inadmissible opinion testimony on his credibility.

"We review a trial court's decision to admit or exclude a law enforcement officer's statements during an interrogation for an abuse of discretion." State v. Notaro, 161 Wn. App. 654, 661, 255 P.3d 774 (2011).

-8-

Under an abuse of discretion standard, the reviewing court will find error only when the trial court's decision (1) adopts a view that no reasonable person would take and is thus "manifestly unreasonable," (2) rests on facts unsupported in the record and is thus based on "untenable grounds," or (3) was reached by applying the wrong legal standard and is thus made "for untenable reasons . . . ."

State v. Sisouvanh, 175 Wn.2d 607, 623, 290 P.3d 942 (2012) (internal quotation marks omitted) (quoting State v. Rohrich, 149 Wn.2d 647, 654, 71 P.3d 638 (2003)).

"Generally, no witness may offer testimony in the form of an opinion regarding the guilt or veracity of the defendant; such testimony is unfairly prejudicial to the defendant 'because it invad[es] the exclusive province of the [jury].'" State v. Demery, 144 Wn.2d 753, 759, 30 P.3d 1278 (2001) (plurality opinion) (alterations in original) (internal quotation marks omitted) (quoting City of Seattle v. Heatley, 70 Wn. App. 573, 577, 854 P.2d 658 (1993)). "Because issues of credibility are reserved strictly for the trier of fact, testimony regarding the credibility of a key witness may also be improper." Heatley, 70 Wn. App. at 577.

"In determining whether a statement constitutes improper opinion testimony, we consider the type of witness involved, the specific nature of the testimony, the nature of the charges, the type of defense, and the other evidence before the trier of fact." Notaro, 161 Wn. App. at 661-62. "Testimony from a law enforcement officer regarding the veracity of another witness may be especially prejudicial because an officer's testimony often carries a special aura of reliability." State v. Kirkman, 159 Wn.2d 918, 928, 155 P.3d 125 (2007). But "'[t]estimony that is not a direct comment on the defendant's guilt or on the veracity of a witness, is otherwise helpful to the jury, and is based on inferences from the evidence is not improper opinion testimony.'" Notaro, 161 Wn. App. at 662 (alteration in original) (quoting Heatley, 70 Wn. App. at 578).

In Notaro, detectives interviewed the defendant before trial. At trial, one of the detectives described the interview to the jury. He testified that the defendant initially blamed his mother for the victim's murder. The prosecutor asked the detective what he said to "'have [the defendant] change his story.'" Notaro, 161 Wn. App. at 665. The detective testified, "'I leaned forward, and I told [the defendant] I didn't believe him.'" Notaro, 161 Wn. App. at 665. Over the defendant's objection, the detective explained:

> I told him I didn't believe him. I said, I don't believe your mother was able to put [the victim's] body in a freezer by herself if [the defendant] had such a difficult time pulling it out and taking it upstairs to bury it.
>
> . . . .
>
> I told him I didn't believe that that's what mothers did when they have a problem such as the problems [sic] they were having. They called their sons, and sons dealt with the problems. Mothers didn't shoot people.

Notaro, 161 Wn. App. at 665 (alteration in original). The detective also testified, "I told [the defendant] to tell me the truth. Tell me the story of what happened." Notaro, 161 Wn. App. at 665. According to the detective, the defendant confessed to the murder.

On appeal, the defendant argued that the trial court admitted improper opinion testimony. In rejecting this argument, Division Two of this court distinguished between improper opinion testimony and testimony regarding what it called "tactical interrogation statements." Notaro, 161 Wn. App. at 669. The latter, it explained, provided no evidence of the interrogating detective's personal beliefs on the defendant's veracity. Rather, it merely provided an "account" of the interrogator's efforts "to challenge the defendant's initial story and elicit responses that are capable of being refuted or corroborated by other evidence or accounts of the event discussed." Notaro, 161 Wn. App. at 669. This account, the court said, "described the police interrogation strategy and helped explain to the jury why [the defendant] changed some parts of his story—but

not others—halfway through the interview." Notaro, 161 Wn. App. at 669. The court concluded, "[T]aken in context, [the detective] did not testify at trial about his personal beliefs; instead, he recounted the full version of each participant's statements during [the defendant's] interrogations." Notaro, 161 Wn. App. at 669.

The statements here are similar to those in Notaro.[2] Detective Graham challenged Marshall's initial story, telling Marshall that he and Detective Miller knew "there was some more things that went on that day." Ex. 23 at 17. He explained to Marshall, "We got one side of the story from [Church], and we don't think it's fair to go much further without getting the other side of the story from you." Ex. 23 at 18. As in Notaro and read in the context of the 73-page interview, these statements and the statements quoted above constitute a legitimate interrogation tactic, not a direct personal opinion on credibility. The detectives' statements during interrogation were calculated to see whether Marshall would change his story. The statements thus permissibly "described the police interrogation strategy" and helped explain to the jury why Marshall "changed some parts of his story—but not others—halfway through the interview." Notaro, 161 Wn. App. at 669.

When Marshall maintained that he had no sexual interest in Church, Detective Miller used a similar tactical strategy. He told Marshall, "I appreciate that you told us, for the most part, I think you've told us the truth and I think you're—you're avoiding the reason why you were knocking on the door." Ex. 23 at 54. Like the prior statement, this statement was also calculated to see whether Marshall would change his story. Viewed

---

[2] Marshall fails to mention Notaro in his opening appellate brief. Marshall filed no reply brief.

in context, it conveyed no personal opinions regarding Marshall's credibility, veracity, or guilt.

We conclude that the trial court properly exercised its discretion to admit the challenged interview statements. But as discussed below, even if we assume that the court erred, we conclude the error was harmless beyond a reasonable doubt.

Marshall argues, and the State does not dispute, that the constitutional harmless error standard applies. "A constitutional error is harmless if the appellate court is assured beyond a reasonable doubt that the jury verdict cannot be attributed to the error." State v. Lui, 179 Wn.2d 457, 495, 315 P.3d 493 (2014). "Under our 'overwhelming untainted evidence' test, we look to the untainted evidence to determine if it was so overwhelming that it necessarily leads to a finding of guilt." Lui, 179 Wn.2d at 495 (quoting State v. Guloy, 104 Wn.2d 412, 426, 705 P.2d 1182 (1985)). Because the State fails to argue that a less stringent standard applies, we assume without deciding that the overwhelming untainted evidence test governs our inquiry.

Overwhelming untainted evidence necessarily leads to a finding that Marshall committed first degree burglary with sexual motivation.[3] During closing arguments,[4] defense counsel acknowledged that Marshall "admitted" entering Church's

---

[3] The trial court instructed the jury that "[a] person commits the crime of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime against a person or property therein, and if, in entering or while in the building or in immediate flight therefrom, that person or an accomplice in the crime assaults any person." It also instructed the jury that "[s]exual motivation means that one of the purposes for which the defendant committed the crime was for the purpose of his sexual gratification."

[4] We note that counsel's argument is not evidence. But he conceded the elements constituting criminal trespass and fourth degree assault.

apartment, sitting on her bed, touching her feet, and stroking her hair. RP (Jan. 17, 2013) at 464. He told the jury, "While in there, there is no question that he touched her. He admitted that. That's an assault, so that's kind of given. He entered there by telling her that he was a plumber. Shouldn't have done that. Unlawful entry." RP (Jan. 17, 2013) at 470. He said the only disputed issues were whether Marshall "entered with the intent at that point in time that he was going to commit a crime inside," and whether "he [did] so for purposes of sexual gratification." RP (Jan. 17, 2013) at 471.

Our record contains overwhelming untainted evidence that Marshall entered Church's apartment with intent to commit a crime and that he committed first degree burglary with sexual motivation. Marshall drove to Church's street after having an argument with his wife. Church testified that Marshall knocked on her door 10 to 20 minutes after her boyfriend left the apartment. Church heard Marshall say he was the "maintenance man." RP (Jan. 15, 2013) at 229. Shannon Glen testified that on the previous day, an unfamiliar man used the same ruse, claiming he was "with maintenance" when his presence was questioned. RP (Jan. 15, 2013) at 288.

Marshall admitted that he knocked on Church's door and that he pretended to be a plumber. He acknowledged that he found Church "attractive." Ex. 23 at 36.

Church testified that Marshall "put his hand on the door and walked through." RP (Jan. 15, 2013) at 229. She said Marshall initiated a conversation. She testified, "I remember at one point feeling uncomfortable and bringing up my boyfriend." RP (Jan. 15, 2013) at 233. She recalled that Marshall stared at her and walked towards her slowly. She said Marshall stroked his crescent wrench "[s]uggestively," pushed

away her hair, and massaged her shoulder. RP (Jan. 15, 2013) at 236. Church

believed she was "going to get raped." RP (Jan. 15, 2013) at 238.

Marshall admitted that he thought he "touched [Church's] hair and stuff . . . ."

Ex. 23 at 29. He also admitted, "[A]nd then I guess I commented on her feet and stuff

and the, like, her feet was like here." RP (Jan. 15, 2013) at 35. He explained:

> She was like sitting like right here. So I was like, um, "You have ni—nice toes,"
> like w—with a pedicure and stuff. So I was like, "Let me see it," so then I, like,
> what I tell you about w—when she let me see it. She didn't say no. So, like, I
> reach and then it was like re—rested right here for a minute.

Ex. 23 at 39. He said, "I like touched the toes and was looking at her." Ex. 23 at 40.

Church testified that Marshall continued to make sexual comments even as she

left the apartment. She said Marshall "asked if my boyfriend goes down on me,

because he would." RP (Jan. 15, 2013) at 240. She said she believed the comment

related to "[o]ral sex." RP (Jan. 15, 2013) at 251.

Officer Rush testified that when she arrived on scene, Church "seemed very

upset" and "looked like maybe she had been crying or was in somewhat of a panic or in

shock." RP (Jan. 15, 2013) at 326. She said Church told her a man "had come into her

apartment and had pretended to be the plumber and had started to touch her and to say

things that were unacceptable, inappropriate to her, and that she had panicked and

escaped from him." RP (Jan. 15, 2013) at 327.

When Detective Miller asked Marshall why he chose Church's apartment,

Marshall had no clear answer. He explained, "I didn't—I didn't like picked it, like, you

don—you don't understand. I didn—I didn't pick it." Ex. 23 at 34. When Detective

Graham asked Marshall what he planned to do inside, he again answered vaguely:

Huh? I was, um, like, I wasn—like I said, I didn't know—what to s—say or nothing . . . so like that was the first thing that came to my mind and then that's why I went to the bathroom, and then the door was open so then, like , as we started talking and stuff, like, like, we just like talking and stuff.

Ex. 23 at 34-35. Marshall said he did not want to have sex with Church and claimed he "wasn't trying to rape or nothing." Ex. 23 at 35. But he offered no explanation for his presence at Church's door other than his vague claim that he was confused, that he did not know what to say, and that the detectives would not understand.[5]

The untainted evidence overwhelmingly shows that Marshall used subterfuge to gain access to a woman he did not know and who was alone in her apartment. During the encounter, Marshall stroked a wrench suggestively, massaged Church, and made a comment referring to oral sex. Church believed she would be raped and fled her apartment in a panicked state. On this record, we are persuaded beyond a reasonable doubt that the jury verdict cannot be attributed to the error, if any, arising from the admission of the challenged statements discussed above. Any error was harmless.[6]

---

[5] During closing arguments, defense counsel told the jury, "Mr. Marshall's statement. Well, it probably—what he explained he did doesn't make sense. He acknowledged it's crazy. He has no explanation for why he did that, other than he was having a fight with his wife, arguing with her." RP (Jan. 17, 2013) at 469.

[6] Marshall argues that defense counsel was ineffective in failing to have the court redact from exhibit 23 Detective Graham's statement on pages 17-19 and Detective Miller's "for the most part" statement on page 54. "A defendant claiming ineffective assistance of counsel must show that counsel's performance was objectively deficient and resulted in prejudice." State v. Emery, 174 Wn.2d 741, 754-55, 278 P.3d 653 (2012). Even if we assume that Marshall can overcome the strong presumption that counsel performed effectively, we conclude that Marshall cannot show prejudice. To show prejudice, Marshall has the burden to establish "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" State v. Thomas, 109 Wn.2d 222, 226, 743 P.2d 816 (1987) (quoting Strickland v. Washington, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). As discussed above, our record contains overwhelming untainted evidence of guilt.

Prosecutorial Misconduct

Marshall contends the prosecutor committed misconduct during closing arguments by arguing that either he or Church lied about why Marshall's CD ended up in Church's laptop. Marshall claimed during his pretrial interview that he and Church talked about music and that Church said she liked music. He also claimed that he left the apartment to retrieve a music CD from his car and that he and Church unsuccessfully attempted to play the CD on Church's laptop. During trial, Church denied talking to Marshall about music. She also claimed she discovered the CD when she returned to her apartment for the first time. The prosecutor told the jury that Marshall's version of the facts made no sense:

> And then we have the CD. The Defendant in his statement says, well, I have this CD, and I went back down to the car, and we liked music, and she didn't know how to get it in, and that's why I was trying to show her. That doesn't make any sense. Tasha Church is the one that brought that CD to law enforcement's attention. She is the one who when she went back upstairs said, my laptop was open, and the bay was open, and the CD was in there, and it says Y2K. Didn't know what it was. Hadn't seen it before, brought it down to Officer Rush. It was Tasha Church who took that CD and said get this out of my apartment.
> So do you think that Tasha Church is lying about that CD, or do you think that the Defendant who has come with this preconceived plan about being a plumber is prepared for, well, maybe if I put this CD in and I get caught, later on I will have a good cover story that we were talking about music. Either way, it doesn't matter, because Tasha Church is not lying about that CD. At no point did they ever sit down and have this discussion that he claims they had about a music CD such that he would go back to his car and get a CD.

RP (Jan. 17, 2013) at 446-47. Defense counsel suggested that neither story was completely true. He told the jury the evidence was open to interpretation:

> So that really has us boiled down to Ms. Church and Mr. Marshall. That's the heart of the case. The reality of what happened in that apartment that day might be somewhere in between what Mr. Marshall said and what Ms. Church said, and that doesn't necessarily mean anybody is lying. You show two people

the same event and they will interpret it differently. They will remember it differently. They see things differently.

RP (Jan. 17, 2013) at 463. In rebuttal, the prosecutor maintained that only Church's story was supported by the evidence:

[Defense counsel] suggested that, well, it's not necessarily that Tasha [Church] or the Defendant is lying, maybe it's a misinterpretation of events. No, one of them is lying. And the question that you need to answer is which one. Is it the innocent victim who is accosted in an apartment by a stranger, or is it the Defendant who lies to get in, flees from the scene, lies to his wife, changes his clothes, cuts his hair and then lies to detectives?

RP (Jan. 17, 2013) at 479-80. Marshall contends the prosecutor committed misconduct in "telling the jurors they were required to figure out who was lying in order to decide the case . . . ." Br. of Appellant at 25.

Marshall concedes that defense counsel failed to object to the prosecutor's argument below. It is well established that "failure to object to an improper remark constitutes a waiver of error unless the remark is so flagrant and ill intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury." State v. Russell, 125 Wn.2d 24, 86, 882 P.2d 747 (1994). "In other words, a conviction must be reversed only if there is a substantial likelihood that the alleged prosecutorial misconduct affected the verdict." Russell, 125 Wn.2d at 86.

Marshall has the burden to establish misconduct and resulting prejudice. State v. Anderson, 153 Wn. App. 417, 427, 220 P.3d 1273 (2009). To establish misconduct, he relies primarily on State v. Fleming, 83 Wn. App. 209, 921 P.2d 1076 (1996). In Fleming, the prosecutor implicitly argued that because the defendants submitted no evidence contrary to the victim's account of an alleged rape, the jury would have to

disbelieve the victim's story to acquit the defendants.[7] The court concluded the argument was misconduct, reasoning that it "misstated the law and misrepresented both the role of the jury and the burden of proof." Fleming, 83 Wn. App. at 213. Here, unlike in Fleming, the prosecutor neither argued nor implied that the jury had to disbelieve Church to acquit Marshall. We are not persuaded that the prosecutor committed flagrant and ill-intentioned misconduct. See State v. Lewis, 156 Wn. App. 230, 241, 233 P.3d 891 (2010) ("Merely asking questions of the jury does not rise to the level of misstating the law or misrepresenting the role of the jury and the burden of proof as in Fleming."); see also State v. Stenson, 132 Wn.2d 668, 727, 940 P.2d 1239 (1997) ("The prosecutor has wide latitude in closing argument to draw reasonable inferences from the evidence and to express such inferences to the jury.").

Marshall argues, "It is highly unlikely a curative instruction could have cured the flagrant, ill-intentioned and prejudicial misconduct in this case." Br. of Appellant at 28. We are not persuaded by this unsupported assertion. We note that the trial court instructed the jury, "You are the sole judges of the credibility of each witness. You are also the sole judges of the value or weight to be given to the testimony of each witness. . . . [T]he lawyers' statements are not evidence." We presume the jury followed

---

[7] The prosecutor in Fleming argued, "'Ladies and gentlemen of the jury, for you to find the defendants, Derek Lee and Dwight Fleming, not guilty of the crime of rape in the second degree, with which each of them have been charged, based on the unequivocal testimony of [D.S.] as to what occurred to her back in her bedroom that night, you would have to find either that [D.S.] has lied about what occurred in that bedroom or that she was confused; essentially that she fantasized what occurred back in that bedroom.'" Fleming, 83 Wn. App. at 213 (emphasis omitted) (alterations in original).

these instructions. Anderson, 153 Wn. App. at 428. We reject Marshall's misconduct claim.[8]

### Community Custody Conditions

Marshall contends the sentencing court lacked statutory authority to impose community custody conditions 13 and 21. We review this challenge de novo. State v. Armendariz, 160 Wn.2d 106, 110, 156 P.3d 201 (2007).

Condition 13 states, "You shall not possess or consume any controlled substances without a valid prescription from a licensed physician." A statute provides, "Unless waived by the court, as part of any term of community custody, the court shall order an offender to . . . (c) Refrain from possessing or consuming controlled substances except pursuant to lawfully issued prescriptions." RCW 9.94A.703(2)(c). But as Marshall argues, nothing in the statute authorized the court to limit potential providers of lawfully-issued prescriptions to licensed physicians.[9] Accordingly, we remand with instructions to strike condition 13 from the judgment and sentence.

Condition 21 states, "Do not possess or peruse any sexually explicit materials in any medium. Your sexual deviancy treatment provider will define sexually explicit material. Do not patronize prostitutes or establishments that promote the commercialization of sex." The State correctly concedes that the sentencing court

---

[8] We also reject Marshall's alternative contention that defense counsel was ineffective in failing to object to the prosecutor's rebuttal argument. As discussed above, the argument was not misconduct. Further, Marshall fails to explain how the argument resulted in prejudice.

[9] RCW 69.41.030 confers prescription-writing authority on several health care providers that may not meet the definition of "licensed physician." For instance, the statute confers prescription-writing authority on dentists.

lacked statutory authority to bar Marshall from possessing or perusing sexually explicit materials, since the record contains no evidence that Marshall's crime involved sexually explicit materials.[10] It also correctly concedes that the court lacked statutory authority to bar Marshall from "patronizing . . . establishments that promote the commercialization of sex." The record again contains no evidence that Marshall's crime involved any establishments that promoted the commercialization of sex. We remand with directions to strike condition 21 from the judgment and sentence except condition 21's unchallenged ban on patronizing prostitutes.

Forfeiture of Property in Evidence

Marshall challenges the portion of his sentence requiring him to forfeit "[a]ll property" taken into custody in conjunction with the case. He requests that we remand with directions to strike the forfeiture provision from his judgment and sentence.

"'[A] court may refuse to return seized property no longer needed for evidence only if (1) the defendant is not the rightful owner; (2) the property is contraband; or (3) the property is subject to forfeiture pursuant to statute.'" City of Walla Walla v. $401,333.44, 164 Wn. App. 236, 244, 262 P.3d 1239 (2011) (alteration in original) (internal quotation marks omitted) (quoting City of Walla Walla v. $401,333.44, 150 Wn. App. 360, 367, 208 P.3d 574 (2009)). In Washington, CrR 2.3(e) governs motions for

---

[10] Under RCW 9.94A.703(3)(f), the court may order an offender to "[c]omply with any crime-related prohibitions." RCW 9.94A.030(10) provides in part, "'Crime-related prohibition' means an order of a court prohibiting conduct that directly relates to the circumstances of the crime for which the offender has been convicted, and shall not be construed to mean orders directing an offender affirmatively to participate in rehabilitative programs or to otherwise perform affirmative conduct."

-20-

the return of lawfully seized property that is no longer needed for evidentiary purposes.[11] State v. Alaway, 64 Wn. App. 796, 798, 828 P.2d 591 (1992).

Marshall failed to move below for the return of any seized property. And he fails on appeal to specify what property, if any, he believes should be returned. The State asserts, and Marshall does not dispute, that the only record of property in evidence is the list of exhibits received by the trial court. We decline to speculate as to which items on this list, if any, belong to Marshall and which, if any, are subject to return. If Marshall believes he has a claim to any of the items, he may move in superior court for a hearing to determine that issue. CrR 2.3(e). His forfeiture claim is not properly before us on appeal.

## CONCLUSION

For the reasons discussed above, we affirm Marshall's conviction. We remand with directions to strike community custody conditions 13 and 21 from the judgment and sentence except for condition 21's ban on patronizing prostitutes.

WE CONCUR:

_____

Cox, J.

Becker, J.

---

[11] CrR 2.3(e) provides in part, "Motion for Return of Property. A person aggrieved by an unlawful search and seizure may move the court for the return of the property on the ground that the property was illegally seized and that the person is lawfully entitled to possession thereof." (Boldface omitted.)