# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  45789-0-II |
| Respondent, | |
| v. | |
| BOBBY JERREL SMITH, II, a/k/a B.J. SMITH, | UNPUBLISHED OPINION |
| Appellant. | |

JOHANSON, C.J. — A jury found Bobby Jerrel Smith II guilty of second degree murder of his neighbor, Robert Fowler.  Smith appeals his conviction and sentence, arguing that (1) the trial court violated his constitutional right to present a defense when it permitted the State to redact portions of Smith's recorded police interview, (2) the trial court erred by admitting a detective's "opinion" statements, and (3) the trial court abused its discretion by refusing to impose a sentence below the standard range.  We hold that (1) any error associated with the redacted interview was harmless, (2) the trial court properly admitted the detective's statements as investigatory tactics and interrogation techniques, and (3) the trial court properly exercised its discretion under the Sentencing Reform Act of 1981 (SRA) (ch. 9.94A RCW).  We affirm the conviction and sentence.

FACTS

I. BACKGROUND

In June 2011, Port Angeles Detective Kevin Spencer responded to a reported shooting. Detective Spencer found Smith outside his home and observed a deceased male, later identified as Fowler, inside the residence. There was a large knife beside Fowler's right arm, blood on Smith's clothing, and five bullet cartridge casings. Bethany Smith, Smith's daughter, was home during the shooting. She had heard an argument between her father and another man, followed by gunshots. Bethany[1] also told police that she heard someone say, "I'm sorry, I'm sorry, please don't."[2] Report of Proceedings (RP) (Oct. 8, 2013) at 73.

Smith willingly accompanied Detective Jason Viada to the police station. Smith told Viada he had known Fowler for approximately two months and that Fowler often came to Smith's home. The two men were neighbors and had become friends, frequently sharing beer and discussing their respective military experiences.

Smith became increasingly concerned about Fowler's erratic behavior and Smith started to carry a gun. Fowler's frequent visits were "stressin' [him] out" because Smith is a disabled veteran and he suffers from post-traumatic stress disorder (PTSD). Ex. 59 at 3. Smith also told Detective Viada he had experienced other situations involving feelings of imminent death in his past.

---

[1] Intending no disrespect, we refer to Bethany Smith by her first name for clarity.

[2] Bethany's testimony was inconsistent regarding whether she heard these words, but the trial court permitted the State to elicit testimony that she initially told police she had heard this statement, ruling that Bethany's original account fell within the excited utterance exception to the hearsay rule.

Smith recounted the events as follows. Smith described Fowler the day of the shooting as "frighteningly delusional" and possibly under the influence of marijuana when Fowler came to Smith's home and demanded money. RP (Oct. 9, 2013) at 28. Fowler became angry and threatened to "cut [Smith's] throat" when Smith refused to loan him money. RP (Oct. 9, 2013) at 22, 28. Smith feared for his life and for his daughter's life when Fowler grabbed a knife from a nearby table.

Fowler came toward him with the knife in his hand notwithstanding Smith's warning that he was armed with a gun. Fowler said, "'I'm gonna get you, you son of a bitch.'" RP (Oct. 8, 2013) at 98-99. Smith fired shots at Fowler. Fowler continued to advance after the first two shots, threatening to kill Smith. When Fowler started to go upstairs, Smith was "just shooting." RP (Oct. 9, 2013) at 21. At some point Fowler fell, and Smith shot Fowler in the head at close range in a downward angle. Detective Spencer also conducted a lengthy interview with Smith, which like Detective Viada's was recorded and transcribed.

## II. PROCEDURE

The State charged Smith with first degree premeditated murder. Before trial, Smith asserted a theory of self-defense and declined to submit any diminished capacity defense based on his PTSD. The State moved in limine to redact portions of Smith's lengthy interview with Detective Spencer where Smith discussed the impact of his PTSD and his experiences in the military.[3] The State planned to play a video recording of the interview and argued that Smith's

---

[3] During this exchange, the trial court asked Smith whether he would be calling an expert witness to discuss his PTSD diagnosis. Smith told the court that he did not plan on doing so because his PTSD was a "generic description" and he was not going to rely on a diminished capacity defense. RP (Oct. 7, 2013 9:13 AM) at 12.

statements in the proposed redacted portion were irrelevant and likely to confuse the jury. Smith opposed the State's motion, arguing that the law required the jury to view the reasonableness of Smith's response during the incident through the eyes of a reasonable person who suffered from PTSD.

In the challenged portion of Detective Spencer's interview of Smith, Smith explained that he had served in the Navy and that he had been diagnosed with PTSD. Smith recalled events during his Navy career in which he experienced a fear of "imminent death." Ex. 95A at 18. He and Detective Spencer discussed similarities between the fear Smith felt during those events and that which he experienced during the altercation with Fowler.

The State reminded the court that its goal was not to redact every mention of Smith's PTSD; it felt simply that Smith's past experiences in the military had no bearing on his conduct during the shooting incident. Satisfied that the fact that Smith suffered from PTSD was mentioned elsewhere in Detective Spencer's interview and also on the tape of Detective Viada's interview and would therefore be heard by the jury, the court granted the State's motion, ruling that the portion of the interview the State sought to redact contained largely irrelevant material in part because Smith was "not relying on PTSD." RP (Oct. 7, 2013) at 22.

Smith also objected to the inclusion of other aspects of the interview with Detective Spencer. Specifically, Smith challenged Detective Spencer's suggestion that the blood evidence undermined Smith's self-defense claim because Detective Spencer was not an expert in this field and Smith requested a limiting instruction. The trial court declined to provide a limiting instruction but opined that Smith was free to cross-examine Detective Spencer.

4

The State's theory was that Smith had become increasingly paranoid and had developed an obsession with the possibility of intruders and the potential threat to his daughter. The State argued that Smith was paranoid about the danger that Fowler allegedly posed. The State called several forensic science experts, each of whom had assisted with the investigation.[4] During its case-in-chief, the State relied principally on this forensic science to demonstrate that Smith's self-defense theory was untenable.

The forensic scientists' testimony uniformly stated that, considering his injuries, had Fowler been holding the knife in his hand during his death, blood and deoxyribonucleic acid (DNA) would have been found on the knife. But no blood was found on the knife.

Kristopher Kern, a blood stain expert, observed "transfer stains" on Fowler's right hand. RP (Oct. 9, 2013) at 51. Kern testified that transfer stains occur when something with a wet blood source comes into contact with a "non-bloody" object and that the knife handle would have had blood stains if it had come into contact with a bloody hand. RP (Oct. 9, 2013) at 52. James Luthy and Mariah Low, other forensic scientists, generally agreed with these opinions.

Low found a miniscule amount of DNA from more than one person on the knife, but she could not identify a match with certainty. Low explained, however, that if someone bleeding as profusely as Fowler was had touched the knife, she would have expected to find a significant amount of DNA. Dr. Daniel Selove, a forensic pathologist, testified that the second or third shot would have rendered Fowler's legs paralyzed and would likely have caused him to lose

---

[4] Each of the State's forensic science witnesses were certified as experts in their individual fields and were employed by the Washington State Patrol Crime Lab.

consciousness. Fowler had been lying down at the time of the final shot, which caused instant death.

The State also called Karla Pennington, Fowler's significant other, and Terry Stevens, Pennington's brother. Pennington recalled that Fowler and Smith were friends and that Fowler was in a good mood and was happy on the day of the shooting. Stevens echoed Pennington's testimony. He spoke with Fowler on the telephone less than 30 minutes before Fowler's death and described Fowler as having been happy and laughing. Furthermore, Pennington explained that Stevens owed her and Fowler a sum of money and Fowler knew that Stevens planned to pay them back on the day of the incident.

Smith's testimony largely followed his initial statements to detectives. Smith let Fowler into his home when he knocked on the door, but maintained that he feared for his life when Fowler threatened to cut his throat with a knife. Smith mentioned that he suffered from PTSD several times before the jury.

The jury found Smith guilty of the lesser included offense of second degree murder. Smith requested a sentence below the standard range because of his "imperfect self-defense," his lack of criminal history, and his military service. RP (Jan. 14, 2014) at 24.

In response, the court said in part,

> Like I indicated to you before there was no threat at that point, absolutely none and you made the decision to terminate the life. . . . So, you know, I believe by mitigating the sentence I'm being asked to disregard the finding of the jury *and I'm not inclined to do so based upon the testimony that was before me.*

RP (Jan. 14, 2014) at 40 (emphasis added). The court sentenced Smith to the low end of the standard range. Smith appeals.

ANALYSIS

I. REDACTED INTERVIEW

Smith contends that the trial court's decision to redact portions of his interview with Detective Spencer denied him his constitutional right to a fair trial by violating his right to present a defense. Smith also argues that the trial court's redaction ruling was based on an erroneous interpretation of the self-defense standard. Even assuming, without deciding, that the trial court erred by excluding relevant evidence, we hold that any error was harmless and that the trial court did not violate Smith's right to present a defense.

A. EXCLUSION OF EVIDENCE

Smith's argument is most fairly characterized as a challenge to the trial court's discretionary ruling to admit or exclude evidence because the Sixth Amendment does not transform all evidentiary errors into errors of constitutional magnitude. *State v. Barry*, 183 Wn.2d 297, 300, 352 P.3d 161 (2015). The trial court's decision to admit or exclude evidence is reviewed for abuse of discretion.[5] *State v. Gunderson*, 181 Wn.2d 916, 922, 337 P.3d 1090 (2014). "There is an abuse of discretion when the trial court's decision is manifestly unreasonable or based upon untenable grounds or reasons," such as the misconstruction of a rule. *State v. Brown*, 132 Wn.2d 529, 572, 940 P.2d 546 (1997) (citing *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995)). We also consider whether a reasonable judge would rule as the trial judge did. *Gunderson*, 181 Wn.2d at 922.

---

[5] To be admissible, evidence must be relevant. ER 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401.

Where error is from violation of an evidentiary rule rather than a constitutional mandate, we do not apply the more stringent "'harmless error beyond a reasonable doubt'" standard. *State v. Thomas*, 150 Wn.2d 821, 871, 83 P.3d 970 (2004) (quoting *Bourgeois*, 133 Wn.2d at 403). Instead, we apply "'the rule that error is not prejudicial unless, within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred.'" *Thomas*, 150 Wn.2d at 871 (quoting *State v. Tharp*, 96 Wn.2d 591, 599, 637 P.2d 961 (1981)).

Here, Smith argues that the trial court erred by redacting a portion of his interview in part because the trial court was persuaded by the State's argument that admitting this evidence would mislead the jury by suggesting there is a subjective element involved in a claim of self-defense. Smith recognizes, correctly, that the State's assertion there is no subjective component associated with a claim of self-defense is misguided. Our courts have long held that self-defense involves both subjective and objective elements.[6] *State v. Read*, 147 Wn.2d 238, 242-43, 53 P.3d 26 (2002).

But even if this mistaken understanding of the law was the foundation of the trial court's decision to exclude relevant and otherwise admissible evidence, Smith's contention fails because any error is harmless. Any error is harmless because the trial court allowed Smith to submit evidence to support the subjective component of his self-defense theory. Smith testified to support

---

[6] A defendant is entitled to have the jury instructed on self-defense if there is some evidence to support the theory. *State v. Walden*, 131 Wn.2d 469, 473, 932 P.2d 1237 (1997). Self-defense has three elements: (1) the defendant subjectively feared that he was in imminent danger of great bodily harm, (2) the defendant's belief was objectively reasonable, and (3) the defendant exercised no greater force than was reasonably necessary. *State v. Werner*, 170 Wn.2d 333, 337-38, 241 P.3d 410 (2010). Self-defense involves both subjective and objective elements. *State v. Read*, 147 Wn.2d 238, 242-43, 53 P.3d 26 (2002). The subjective element considers the defendant's acts "in light of all the facts and circumstances the defendant knew when the act occurred." *Read*, 147 Wn.2d at 243. The objective elements consider "what a reasonable person would have done if placed in the defendant's situation." *Read*, 147 Wn.2d at 243.

his claim of self-defense, mentioning that he suffered from PTSD several times before the jury. No ruling prevented Smith from presenting additional evidence regarding his PTSD; Smith could have testified about the connection between his military near death experiences and how he felt the day of the shooting.

The jury heard Smith describe his PTSD and his past experience with fear of imminent death in his interview with Detective Viada, which, unlike Detective Spencer's interview, was not redacted. Detective Spencer also referenced the stress Smith must have felt during the shooting incident based on Smith's having faced "imminent death situations before." Ex. 95A at 84. Any prejudice resulting from excluding some evidence related to Smith's PTSD is slight because of the other PTSD evidence admitted. Smith did present his subjective perspective to the jury.

In addition, the evidence that Smith did not act in self-defense was strong. The forensic scientists' testimony uniformly stated that if Fowler had the knife in his hand during his death, blood and DNA would have been found on the knife. But no blood was found on the knife.

Dr. Selove explained that Fowler would have been incapacitated after the third of five total shots and Smith himself admitted that even when he realized Fowler was severely wounded and "pretty bad off," that he would not stop shooting until Fowler stopped moving. RP (Oct. 14, 2013) at 85. At some point, Smith shot Fowler in the head at close range in a downward angle. And the jury was properly instructed on all elements of a self-defense claim. Accordingly, Smith cannot demonstrate that the outcome of his trial would have been materially affected had the alleged error not occurred. We hold that Smith's argument fails.

## B. RIGHT TO PRESENT A DEFENSE

In a closely-related argument, Smith claims he was denied his right to present his self-defense theory because of the court's exclusion of some of the PTSD evidence. For many of the same reasons discussed above, we disagree; Smith was not denied his right to present his self-defense theory. Thus, any error does not rise to a constitutional magnitude.

We review a claim of a denial of Sixth Amendment rights de novo. *State v. Iniguez*, 167 Wn.2d 273, 280, 217 P.3d 768 (2009). "'The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations.'" *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)). The United States and Washington Constitutions guarantee the right to present a defense. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *State v. Maupin*, 128 Wn.2d 918, 924, 913 P.2d 808 (1996). A defendant's right to an opportunity to be heard in his defense is basic in our system of jurisprudence. *Chambers*, 410 U.S. at 294.

Here, the trial court's ruling did not *prevent* Smith from presenting his defense. The trial court did not attempt to otherwise restrict Smith's presentation of his self-defense theory. The State asserted that it would not object to other testimony concerning Smith's PTSD. Smith testified about suffering from PTSD. And many of the redacted statements were cumulative. Moreover, Smith requested, and the trial court provided, a legally adequate self-defense instruction that included both the subjective and objective elements of a self-defense claim.

Accordingly, the trial court's ruling limited the evidence Smith could use to support his theory, but it did not *prevent* Smith from presenting his self-defense claim. In the context of the

evidence presented, we cannot say that Smith was denied his constitutional right to a fair trial. We hold that Smith's constitutional right to present a defense was not violated.

## II. IMPERMISSIBLE OPINION ON GUILT

Smith next argues that the trial court erred by admitting impermissible opinions on guilt made by Detective Spencer during his interview with Smith. Specifically, Smith challenges Detective Spencer's statements that scientific evidence "goes against" Smith's statements and Detective Spencer's stated opinion that blood would have been on the knife due to the scientific properties of blood if Fowler was holding the knife as Smith claimed. Ex. 95A at 75. Smith contends these statements were impermissible opinions because (1) Detective Spencer implied that Smith's account of the events was incredible and (2) Detective Spencer lacked the expertise to offer scientific conclusions. We hold that the statements do not constitute impermissible opinions on guilt because they were deliberately used as interrogation tactics during a pretrial interview of Smith.

We review a trial court's decision to admit or exclude a law enforcement officer's statements during an interrogation for an abuse of discretion. *State v. Demery*, 144 Wn.2d 753, 758, 30 P.3d 1278 (2001) (plurality opinion); *State v. King*, 167 Wn.2d 324, 331, 219 P.3d 642 (2009) ("'Generally, no witness may offer testimony in the form of an opinion regarding the guilt or veracity of the defendant; such testimony is unfairly prejudicial to the defendant because it invad[es] the exclusive province of the [jury].'" (internal quotation marks omitted) (alterations in original) (quoting *Demery*, 144 Wn.2d at 759)). Neither a lay nor an expert witness "'may testify to his opinion as to the guilt of a defendant, whether by direct statement or inference.'" *King*, 167 Wn.2d at 331 (quoting *State v. Black*, 109 Wn.2d 336, 348, 745 P.2d 12 (1987)). Admitting

11

impermissible opinion testimony regarding the defendant's guilt may be reversible error because it violates a defendant's constitutional right to a jury trial, including the independent determination of the facts by the jury. *Demery*, 144 Wn.2d at 759.

But our courts have held that statements made during a pretrial interview and accompanying testimony at trial that assists in providing context to those statements are not the types of statements that carry a special aura of reliability usurping the province of the jury. *Demery*, 144 Wn.2d at 763-65; *State v. Notaro*, 161 Wn. App. 654, 669, 255 P.3d 774 (2011). Instead, such trial testimony is an account of tactical interrogation statements designed to challenge a defendant's initial story and is not opinion testimony. *Demery*, 144 Wn.2d at 763-65.

Smith contends that Detective Spencer's statements were impermissible opinions on guilt, particularly those statements regarding the properties of blood, because he was not an expert. For instance during the interrogation of Smith, Detective Spencer told Smith that the scientific evidence "goes against" Smith's statements and "it's very clear [Fowler] did not have the knife in his hand in the beginning." Ex. 95A at 75-76. Detective Spencer opined that blood would have been on the knife due to the scientific properties of blood if Fowler was holding the knife as Smith claimed. Detective Spencer then discussed differences in the properties of blood between humans and animals.

Here, the trial court declined to redact these statements, but emphasized that Smith would be able to cross-examine Detective Spencer on issues including his expertise and the basis of his opinion. When Smith did so, Detective Spencer explained that he knew that it was not necessarily true that there was no proof that Fowler touched the knife. Detective Spencer explained that he had been using a ruse to see whether Smith would change his story.

These are precisely the types of statements considered tactical interrogation statements and therefore not considered impermissible opinion testimony. *Demery*, 144 Wn.2d at 763-65. As in *Notaro*, Detective Spencer's trial testimony about his interrogation statements clarified for the jury that he was not expressing his personal belief on Smith's veracity or his individual opinion on guilt. 161 Wn. App. at 669-70. Accordingly, we hold that the trial court did not err by admitting impermissible opinion testimony and we reject Smith's claim.

### III. EXCEPTIONAL SENTENCE

Smith argues that the trial court's refusal to consider an exceptional sentence below the standard range based on his "failed defense" constitutes reversible error. Br. of Appellant at 35. Because the trial court properly exercised its discretion in sentencing Smith, his argument fails.

The SRA provides that certain "failed defenses" may constitute mitigating factors supporting an exceptional sentence below the standard range. These "failed defense" mitigating circumstances include self-defense, duress, mental conditions not amounting to insanity, and entrapment. RCW 9.94A.535(1)(c). Where a defendant has requested a sentence below the standard range, review is limited to circumstances where the court has refused to exercise discretion or has relied on an impermissible basis for refusing to impose an exceptional sentence below the standard range. *State v. Garcia-Martinez*, 88 Wn. App. 322, 330, 944 P.2d 1104 (1997). A court refuses to exercise its discretion if it declines categorically to impose an exceptional sentence below the standard range under any circumstances. *Garcia-Martinez*, 88 Wn. App. at 330.

Here, the sentencing court stated that it "believe[d] by mitigating the sentence [it was] being asked to disregard the finding of the jury and [it *was*] *not inclined to do so based upon the*

13

No. 45789-0-II

*testimony that was before [it].*" RP (Jan. 14, 2013) at 40 (emphasis added). Sentencing courts cannot categorically refuse to consider imposing an exceptional sentence based on a failed defense merely because a jury rejected the same. *State v. Jeannotte*, 133 Wn.2d 847, 855, 947 P.2d 1192 (1997). But the sentencing court here stated that it was not inclined to impose such an exceptional sentenced *based on the testimony it heard*. Read in context, the court exercised its discretion based on the circumstances presented. It did not categorically refuse to consider an exceptional sentence nor did the court mistakenly believe that it could not do so. Therefore, we hold that the trial court did not misconstrue its sentencing authority.

Accordingly, we affirm Smith's conviction and sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, C.J.

We concur:

WORSWICK, J.

MELNICK, J.

14