# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON, )
) DIVISION ONE
Respondent, )
) No. 75465-3-I
v. )
)
TYE GLEN WEST, )
) UNPUBLISHED OPINION
Appellant. )
) FILED: October 30, 2017
_____ )

2017 OCT 30 AM 11:25
COURT OF APPEALS DIV 1
STATE OF WASHINGTON
FILED

DWYER, J. — Tye West appeals from the judgment entered on a jury's verdict convicting him of one count of trafficking in stolen property in the first degree. On appeal, West contends that the trial court erred by permitting two detectives to testify that they told West during an interrogation that his explanation of how he came into possession of stolen jewelry did not make sense. The trial court erred, West asserts, because the detectives' testimony amounted to an impermissible opinion regarding his credibility in violation of ER 608(a). We conclude to the contrary. The detectives' testimony was properly admitted on the ground that it aided the jury in understanding how the detectives' statements resulted in West changing his explanation of how he came into possession of the stolen jewelry.

West also contends that the State did not present sufficient evidence at trial to prove that he had knowingly trafficked in stolen property. We conclude

that sufficient evidence was, in fact, adduced at trial to support the jury's verdict. Accordingly, we affirm.

I

West was arrested after a police investigation determined that he had sold several pieces of stolen jewelry that had been reported missing after a residential burglary. During the burglary, a man and a woman entered a residence in rural Snohomish County. When the male burglar was discovered in the residence, he and the female burglar fled, grabbing whatever possessions were at hand.

They ran to a car parked on the road next to the end of the residence's long driveway. The car was parked behind a line of trees. A third individual was waiting in the car's driver seat. The burglars entered the car and the car drove away. Among the items that were later reported stolen from the residence were unique pieces of jewelry, including a horseshoe-shaped ring that was faceted with multi-colored stones, a yellow-gold chain bracelet, and a small yellow-gold hoop earring.

Detective Margaret Ludwig conducted a search for the stolen jewelry using an electronic records database of commercial businesses who buy and sell valuable items, including jewelry. Her search identified sales records relating to pieces of jewelry that had been reported stolen during the burglary. Her search further indicated that West was the person who had sold the jewelry to the businesses.

West was arrested and brought in for questioning. Detective Ludwig and Sergeant James Maples conducted the interrogation and began by asking West

- 2 -

general questions about himself. West said that his grandmother's death and being shot by his brother had left him feeling despondent. West said that, as a result, he started using drugs.

Immediately thereafter, Detective Ludwig told West about the jewelry sales records and asked West to tell her how he had acquired the jewelry. West replied that he had traded his heroin for the jewelry. The detectives responded that his explanation did not make sense. They said that it was unlikely that, as a heroin user, he would trade his heroin for jewelry. West replied that he had extra heroin to spare and that he had been willing to trade for it.

Detective Ludwig then told West that she knew that he had sold the jewelry on the same day that it had been reported stolen. At that juncture, West replied that he was tired of being a drug addict and the lifestyle that it involved. West then gave a different explanation to the detectives as to how he came into possession of the jewelry.

West said that on the day in question he had picked up two individuals, named David and Roshell, in his car. West said that David suggested that they go to a house where David used to live so that he could "grab some stuff." West said that he drove to the location that David had selected and parked his car on the road near the end of the residence's long driveway. West said that David and Roshell got out of the car and walked down the driveway while he waited in the car. Sometime later, David and Roshell came running back to the car. When David entered the car, he said to West, "Get out of here. I got in a fight with somebody." West drove away.

West said that, thereafter, David gave him several pieces of jewelry in exchange for driving David and Roshell around in his car. West said that, on the same day, he drove to two different businesses and sold jewelry that David had given him. The jewelry that West sold that day included a horseshoe-shaped ring, a yellow-gold chain bracelet, and a small yellow-gold hoop earring.

West also recounted that he had engaged in this behavior with David in the past. West said that he would drop David off at the end of a residence's driveway and that David would return later with a laptop or a television set. West said that, on these occasions, he never asked David about the items upon David's return. West said that he later sold those items on David's behalf.

Upon prompting by the detectives, West said that he would be willing to provide them a tape-recorded statement of the narrative that he had just given. Near the end of the taped session, West became more emotional than he had been at the beginning of the interrogation.

West was charged, upon amended information, with one count of trafficking in stolen property in the first degree and one count of residential burglary. Before trial, West moved to exclude the proposed testimony of the interrogating detectives regarding their statements to West during the interrogation to the effect that his narrative did not make sense. The State replied that the detectives' statements were important in helping "the jury to understand why he changed his story."

The trial court ruled that the detectives "may not offer an opinion as to whether or not [West] was lying or not telling the truth," but that the detectives

may testify as to what they "said to the defendant to prompt him to then make additional statements."

At trial, the State called several witnesses, including the interrogating detectives, the victims of the residence from which the jewelry was stolen, a police officer who had investigated the burglary, and employees from the businesses to which pieces of the stolen jewelry had been sold.

The jury convicted West of one count of trafficking in stolen property in the first degree and acquitted him on the charge of residential burglary.

## II

West contends that the trial court erred by permitting the detectives to testify that during an interrogation they told West that his initial explanation of how he came into possession of the stolen jewelry did not make sense. The trial court erred, West asserts, because the detectives' statements constituted an impermissible opinion on his veracity, in violation of ER 608(a). We disagree.

"We review a trial court's decision to admit or exclude a law enforcement officer's statements during an interrogation for an abuse of discretion." State v. Notaro, 161 Wn. App. 654, 661, 255 P.3d 774 (2011) (citing State v. Demery, 144 Wn.2d 753, 758, 30 P.3d 1278 (2001) (lead opinion); State v. Darden, 145 Wn.2d 612, 619, 41 P.3d 1189 (2002)). "A witness may not offer testimony in the form of an opinion regarding the guilt or veracity of the defendant." Notaro, 161 Wn. App. at 661 (citing Demery, 144 Wn.2d at 759 (lead opinion); City of Seattle v. Heatley, 70 Wn. App. 573, 577, 854 P.2d 658 (1993)). "Such testimony is irrelevant and invades the defendant's right to a jury trial and invades the jury's

exclusive fact-finding province." Notaro, 161 Wn. App. at 661 (citing State v. Kirkman, 159 Wn.2d 918, 927, 155 P.3d 125 (2007); Demery, 144 Wn.2d at 759 (lead opinion); State v. Dolan, 118 Wn. App. 323, 329, 73 P.3d 1011 (2003)).

With regard to the precise issue presented, a recent Supreme Court decision is instructive.

> Police officers are generally not permitted to testify about a defendant's veracity. State v. Demery, 144 Wn.2d 753, 759, 30 P.3d 1278 (2001) (plurality opinion) ("[N]o witness may offer testimony in the form of an opinion regarding the guilt or veracity of the defendant."). *But an officer may repeat statements made during interrogation accusing a defendant of lying if such testimony provides context for the interrogation.* Id. at 763-64 (discussing State v. O'Brien, 857 S.W.2d 212, 221 (Mo. 1993), and Dubria v. Smith, 224 F.3d 995, 1001-02 (9th Cir. 2000)); see also State v. Kirkman, 159 Wn.2d 918, 931, 934, 155 P.3d 125 (2007).

In re Pers. Restraint of Lui, 188 Wn.2d 525, 555, 397 P.3d 90 (2017) (emphasis added).

The Lui decision is consistent with this court's decision in Notaro, 161 Wn. App. 654. The Notaro court held that the trial court properly allowed two detectives to testify at trial that they told Notaro during an interrogation that his story was not credible. 161 Wn. App. at 661. The trial court properly admitted this evidence, the appellate court concluded, because the detectives' trial testimony, taken in context, "described the police interrogation strategy and helped explain to the jury why Notaro changed some parts of his story—but not others—halfway through the interview." Notaro, 161 Wn. App. at 669.

Both Lui and Notaro relied upon our Supreme Court's decision in Kirkman, 159 Wn.2d 918. The court therein addressed a distinct, but related, circumstance—whether a detective's testimony regarding an interview protocol

administered to a child concerning the child's ability to tell the truth constituted impermissible opinion evidence. The court answered in the negative, concluding that, "[b]y testifying as to this interview protocol, [the detective] 'merely provided the necessary context that enabled the jury to assess the reasonableness of the . . . responses.'" Kirkman, 159 Wn.2d at 931 (third alteration in original) (quoting Demery, 144 Wn.2d at 764 (lead opinion)).[1]

Thus, adhering to the underlying reasoning of Kirkman, our Supreme Court and this court have each held that a detective "may repeat statements made during interrogation accusing a defendant of lying if such testimony provides context for the interrogation" without those statements constituting impermissible opinion testimony. Lui, 188 Wn.2d at 555 (citing Demery, 144 Wn.2d at 763-64 (lead opinion)); Kirkman, 159 Wn.2d at 931; see also Notaro, 161 Wn. App. at 669.

Here, before trial began, West moved to exclude the detectives' proposed testimony that they told West during the interrogation that his initial explanation of how he came into possession of the stolen jewelry did not make sense. The State replied that it offered the detectives' statements to explain why West changed his story midway through the interrogation.

The trial court denied West's motion, ruling that the detectives "may not offer an opinion as to whether or not [West] was lying or not telling the truth" but

---

[1] The parties spar over what they view as an uncertainty in the law arising from Demery, 144 Wn.2d 753, a divided decision (4-1-4) of our Supreme Court. However, in light of the court's decisions in Kirkman and Lui, and this court's decision in Notaro, any ambiguity caused by the fractured opinion has been resolved.

that they may testify as to what they "said to the defendant to prompt him to then make additional statements."

At trial, the State elicited testimony from Detective Ludwig showing how West changed his story during the interrogation. Detective Ludwig testified that, after she and Sergeant Maples brought West in for questioning, they inquired into how he came into possession of the jewelry that he had sold. West said that he had traded drugs in exchange for the jewelry. The following exchange then took place:

> Q. Okay. And did you ask him anything more about this exchange of drugs for jewelry?
> A. *Well, I told him that I felt that was an unlikely scenario; that he would give away his drugs in exchange for jewelry. So . . .*
> Q. What was his response to that?
> A. He said that he had extra; so he made the trade.
> . . . .
> Q. Okay. So initially -- I'm going to try to make sure I don't keep interrupting you, and I'm getting things off track. So initially when he's in the interview room with you, he is telling you he exchanged the jewelry for drugs. He got -- he got the jewelry in exchange for drugs at the casino.
> A. Yes.
> Q. What happened at that point to switch the conversation to the burglary?
> A. *Well, at that -- like I said, I didn't think it was a likely scenario. It's not one that I have heard come up. So that's when I confronted him and told him that I didn't think that was -- that he was telling us everything that he knew about what happened or where he got this jewelry from.*
> Q. Who brought up the burglary?
> A. I did.
> Q. So tell us about the conversation then.
> A. I told him this stuff came from somebody's house. The stuff that he sold, he sold the same day that it came out of somebody's house.
> . . . .
> Q. After you confronted him with the fact that -- you told him you didn't believe this is what happened, the story he told you, what was his response?

A. Oh, okay. He -- he told me that he was sick of his lifestyle and he was done with being an addict, and his whole -- the whole lifestyle that goes with it.

Q. Okay. So what did he tell you about it after that?

A. What he told me was that he had picked up David and Roshell -- he wouldn't tell me where he picked them up because at this point I'm obviously interested in finding -- finding out where David and Roshell are at. But he wouldn't tell me where he picked them up at. He said they drove around, they ended up [in] the Warm Beach area, and ended up at some old man's house, and smoked some dope, and then that's when David told him, "Hey, let's go to this house. I want to grab some stuff. I used to live there." And so he drove him there, and he waited in the vehicle, and then he said the next thing he knew was that David came running to the car saying, "Get out of here. I got in a fight with somebody."

(Emphasis added.)

Later, Sergeant Maples testified similarly:

Q. When you said Detective Ludwig confronted him with pawning the jewelry, at that point did you mention that it had been associated with a burglary?

A. No.

Q. So when she confronted him, what did he tell her?

A. That he had met some guy and sold him heroin for the jewelry. *We told him that it doesn't really work that way. Most heroin users aren't going to give up heroin to get jewelry in exchange for it. It's the other way around.* And continued to talk to him regarding the pawning of it. He was admitting the pawning portion, but was only saying that he had met this person who he exchanged the heroin for the jewelry.

. . . .

This wasn't a quick conversation. This was a lengthy conversation that took place. *We kept interviewing him, pointing out his inconsistencies. Things that he was saying just didn't make sense.* And at some point when he wouldn't come from the story that he was just given the jewelry for heroin, we confronted him at that point about where the jewelry had come from, that it had come from a burglary that involved a fight taking place with the homeowner.

. . . .

Q. So after -- you've explained that he mentioned the name David now after you confronted him with the burglary, what happened after that?

- 9 -

A. I asked him who the female was. He initially denied anything about a female. *Again, we confronted him that we didn't believe he was being completely truthful with us.*

(Emphasis added.)

The trial court did not abuse its discretion. The detectives' statements were properly admitted to help the jury understand what prompted West during the interrogation to make additional statements to the detectives and change his explanation. Indeed, akin to the properly admitted testimony in Notaro and Lui, Detective Ludwig's and Sergeant Maples' statements provided necessary context to the statements that West made during the interrogation.

There was no error.[2]

## III

West next contends that insufficient evidence supports the jury's verdict. This is so, he asserts, because the State did not prove that he knowingly trafficked in stolen jewelry. We disagree.

The due process clauses of the federal and state constitutions require that the State prove every element of a crime beyond a reasonable doubt. U.S. CONST. amend. XIV, § 1; WASH. CONST. art. I, § 3; Apprendi v. New Jersey, 530 U.S. 466, 476-77, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). "[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be . . . to determine whether the record evidence could

---

[2] West contends that, in determining whether trial testimony regarding statements made during an interrogation constitutes impermissible opinion testimony, the issue is whether an officer's trial testimony closely approximates a taped recording of an interrogation.

West is incorrect. For the reasons addressed herein, the proper inquiry is whether the testimony was offered in order to "provide[] context for the interrogation." Lui, 188 Wn.2d at 555.

reasonably support a finding of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); State v. Green, 94 Wn.2d 216, 220-21, 616 P.2d 628 (1980). A claim of evidentiary insufficiency admits the truth of the State's evidence and all reasonable inferences from that evidence. State v. Kintz, 169 Wn.2d 537, 551, 238 P.3d 470 (2010). Thus, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319. We defer to the jury on questions of conflicting testimony, credibility of witnesses, and persuasiveness of the evidence. State v. Killingsworth, 166 Wn. App. 283, 287, 269 P.3d 1064 (2012).

West was charged with one count of trafficking in stolen property in the first degree. The pertinent statute provides that "[a] person who knowingly initiates, organizes, plans, finances, directs, manages, or supervises the theft of property for sale to others, or who *knowingly traffics in stolen property, is guilty of trafficking in stolen property in the first degree*." RCW 9A.82.050(1) (emphasis added). "'Traffic' means to sell, transfer, distribute, dispense, or otherwise dispose of stolen property to another person, or to buy, receive, possess, or obtain control of stolen property, with intent to sell, transfer, distribute, dispense, or otherwise dispose of the property to another person.'" RCW 9A.82.010(19). With its prohibition on trafficking stolen property, "the legislature clearly intended to prohibit any commercial transaction involving property known to be stolen." State v. Hermann, 138 Wn. App. 596, 604, 158 P.3d 96 (2007).

"[B]are possession of recently stolen property alone is not sufficient to justify a conviction." State v. Couet, 71 Wn.2d 773, 775, 430 P.2d 974 (1967) (citing State v. Portee, 25 Wn.2d 246, 170 P.2d 326 (1946)). "However, possession of recently stolen property in connection with other evidence tending to show guilt is sufficient." Couet, 71 Wn.2d at 775. Indeed, circumstantial evidence, as reliably as direct evidence, can support that a suspect "knowingly" trafficked in stolen property in violation of RCW 9A.82.050(1). See, e.g., Killingsworth, 166 Wn. App. at 287. "[I]nferences based on circumstantial evidence must be reasonable and cannot be based on speculation." State v. Vasquez, 178 Wn.2d 1, 16, 309 P.3d 318 (2013).

The State presented the following evidence at trial. West, upon David's request, drove David and Roshell to the residence in question. David explained to West that he used to live there and wanted to "grab some stuff." Upon their arrival, West did not park his car in the front of the residence or in its long driveway but, rather, parked his car behind a line of trees on the road adjacent to the residence's driveway. West waited in the car for David and Roshell. After a time, David and Roshell ran to West's car with David cradling items in his hands as he ran. David told West to drive away, saying that he "got in a fight with somebody." West complied and drove away. That same day, David gave West jewelry in appreciation for driving them around in West's car.

Later, during West's interrogation, West gave one explanation of the circumstances under which he obtained the jewelry—that he traded his drugs for it. But West subsequently changed his story when the detectives confronted him

with statements that his explanation did not make sense and that they knew that the jewelry that West had sold had been stolen that same day. Thereafter, in his tape-recorded retelling, West became more emotional than he had been earlier during the interrogation.

West's knowledge that he had sold stolen jewelry can reasonably be inferred from the direct and circumstantial evidence adduced by the State at trial. First, a reasonable inference can be drawn that West knew that David had stolen possessions from the residence in question. This can be plainly inferred given the distance that West parked away from the residence (rather than parking in front of the residence), that West parked behind a line of trees on the road (rather than parking in the driveway), that West waited in the car for David and Roshell to return (rather than entering the residence with them), that West saw David and Roshell run from the residence toward West's car, that David was carrying possessions with him as he ran, that, upon getting into West's car, David told him to "get out of here", and that David told West that he got into a fight with someone in the residence.

Furthermore, based upon the evidence adduced at trial, a reasonable inference can be drawn that West knew that the jewelry that David had given him had been stolen from the residence in question earlier that day. This is so given that David gave West the pieces of jewelry on the same day that the burglary had occurred, that David gave West the jewelry *after* it had been stolen from the residence, and that, in appreciation for driving them around, David gave West jewelry—an earring, bracelet, and a ring—rather than some other form of

remuneration. Further supporting these inferences is West's admission that he and David had engaged in this process in the past, with items as large as television sets and laptops.

Moreover, considering that West changed his story and became more emotional during the interrogation when the detectives confronted him with both the inconsistencies in his story and the connection between the burglary and the jewelry that he had sold, the jury could also reasonably infer that West had a guilty conscience arising from these events, thereby showing that he knew that he had sold stolen jewelry.

Thus, viewed in a light most favorable to the State, a reasonable inference can be drawn from the State's direct and circumstantial evidence that West had knowingly sold stolen property. Accordingly, the State presented sufficient evidence to support the jury's verdict.

IV

The State has indicated that it will not seek appellate costs in this appeal. Accordingly, we direct that no such costs be imposed. RAP 14.2.

Affirmed.

We concur:

Trickey, J

- 14 -