# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 57268-1-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| ANDREW HOUSTON POINTER, III, | |
| Appellant. | |

CHE, J. — Pointer appeals his conviction for first degree murder. At trial, Pointer contended he was acting in self-defense, which would make the homicide justifiable. The trial court gave jury instructions on self-defense, first aggressor, no duty to retreat, and the definition of necessary. Pointer challenges the instructions on first aggressor and the definition of necessary, the sufficiency of the evidence to prove premeditated intent, and whether the State disproved Pointer's self-defense theory. Pointer raises additional challenges in a statement of additional grounds (SAG).

We hold (1) there was sufficient evidence to show that Pointer acted with premeditated intent, (2) there was sufficient evidence to disprove self-defense, (3) assuming without deciding the trial court erred by giving the jury instruction defining necessary, the error was harmless, and (4) Pointer did not receive ineffective assistance of counsel. Because Pointer does not meet his burden under RAP 2.5 to warrant review of unpreserved issues, we decline to reach (1) whether the first aggressor instruction was supported by sufficient evidence and (2) whether the trial court

should have sua sponte given instructions that words alone could not make the defendant the first aggressor and one for "revived" self-defense.[1]

Thus, we affirm.

FACTS

The State charged Andrew Pointer with first degree murder of Lawrence Jeffries, attempted first degree murder of Cassie Houston-Collazo, attempted first degree murder of Jeffries, first degree unlawful possession of a firearm, and first degree manslaughter of Jeffries.

I. BACKGROUND

In August 2019, Houston-Collazo lived in a townhouse with her son and her daughter, AJ. Pointer sometimes stayed at Houston-Collazo's house. Pointer and Houston-Collazo had an on-again, off-again relationship. Jeffries, AJ's dad, did not live with Houston-Collazo but maintained a close relationship with Houston-Collazo.

Pointer and Jeffries disliked each other; Houston-Collazo once said, Jeffries "hated" Pointer. 9 Rep. of Proc. (RP) at 1029. Pointer was afraid of Jeffries because Jeffries was "way bigger" than Pointer. 11 RP at 1302. Pointer and Houston-Collazo argued over Houston-Collazo's continued contact with Jeffries. Pointer was suspicious that Houston-Collazo was still romantically involved with Jeffries.

---

[1] "Washington has adopted the revival theory of self-defense." *State v. Dennison*, 115 Wn.2d 609, 617, 801 P.2d 193 (1990). Before the right to self-defense may be revived to justify or excuse a homicide, an aggressor must withdraw in good faith "from the combat at such a time and in such a manner as to have clearly apprised his adversary that he in good faith was desisting, or intended to desist, from further aggressive action." *Id.* (quoting *State v. Craig*, 82 Wn.2d 777, 783, 514 P.2d 151 (1973)).

On the evening of August 3, during an argument, Houston-Collazo told Pointer that he needed to leave the townhouse, but he did not. Houston-Collazo then asked Pointer to take her to the store and he agreed. Jeffries arrived just as Houston-Collazo and Pointer got into their car to leave. Houston-Collazo got out of the car and told Pointer to lock the door to avoid a conflict with Jeffries. Houston-Collazo talked briefly with Jeffries, then Houston-Collazo and Pointer left to pick up Pointer's son.

During the drive, they argued about Houston-Collazo being involved with Jeffries. When they arrived, Houston-Collazo ran away from Pointer and called Jeffries to pick her up. Eventually, Pointer found Houston-Collazo on a sidewalk and Jeffries arrived shortly thereafter with Erik White. Jeffries and Pointer got into a physical fight with Jeffries repeatedly punching Pointer.[2] Jeffries told Pointer, "Leave [Houston-Collazo] alone. I'm tired of my kids seeing their mom hurt." 9 RP at 972.

Pointer's teenage son approached the fight and Jeffries punched him. During the fight, AJ, who was on the phone with Houston-Collazo, heard Pointer say, "oh, you want to hit me in front of my son?" 4 RP at 238 Houston-Collazo and White were able to break up the fight.

Houston-Collazo left with White and Jeffries to pick up Derick Crump.[3] After the fight, Pointer and his son went to his son's house and then to Pointer's sister's house where Pointer cleaned off the blood on his face and changed into all black clothes.

---

[2] Prior to the fight, Pointer's jaw had been wired shut and he used a cane to walk due to a limp from a previous leg injury.

[3] Houston-Collazo saw that Derick Crump was carrying a firearm.

When Pointer arrived at Houston-Collazo's home, AJ let him in and he began packing.[4] AJ's friend, MJ, was also there. According to MJ, Pointer did not appear to be carrying a firearm.

AJ called her mom to let her know Pointer was there. Pointer grabbed AJ's phone and told Houston-Collazo that he was leaving.[5] Pointer had a weird tone when Pointer said to Houston-Collazo "come home, baby and make sure you bring your baby daddy. I just want to talk" and "nothing bad is going to happen. Just bring [Jeffries]." 4 RP at 242, 8 VRP at 891. As Pointer was leaving, he told AJ that he might not see her "for a while." 4 VRP at 244. After leaving, Pointer realized he did not have his wallet with him and needed to return to retrieve it.

Houston-Collazo and Jeffries arrived at the front door of the townhouse and talked with AJ and MJ. According to MJ, Jeffries did not appear to be carrying a gun. White and Crump remained in the car initially. Someone yelled, "he's in the back." 4 RP at 248.

## II. THE SHOOTING

At trial, the witnesses testified to the facts discussed above but witnesses testified to differing accounts of the shooting.

In Houston-Collazo's account, she walked to the back alley[6] and watched Pointer exit his parked car from the driver's side. Jeffries was a little behind Houston-Collazo. Houston-Collazo saw a gun in Pointer's hand and she ran between some cars and ducked, but she saw Jeffries continue walking towards Pointer. Houston-Collazo saw the muzzle flash from Pointer's gun, and

---

[4] Pointer did not have a key to Houston-Collazo's house at this time.

[5] Pointer no longer had his phone with him and intended to retrieve it from a stop earlier in the evening.

[6] When looking at the front of the townhouse, there is a townhouse to the left and a grassy area to the right. There is an alley on the back side of the townhouse where residents often park.

4

she heard one gunshot followed by more. She saw Pointer shoot two to three times. Houston-Collazo watched Pointer get in his car.

In MJ's account, MJ was looking towards the alley while holding back AJ during the shooting. MJ saw Pointer shoot Jeffries and Jeffries fall over. MJ heard a couple shots together, a pause, and then another shot or two. MJ saw Pointer put the gun in his waist area and get in his car.

Two neighbors heard gunshots and then witnessed Pointer reverse his car over Jeffries. Pointer then ran over Jeffries again to exit the alley.

The lead detective testified that the closest he could place Jeffries to Pointer was as follows: "Pointer near the open driver's side, . . . and Mr. Jeffries near the rear passenger side." 10 RP at 1202.

A forensic scientist expected to find gunshot residue on the target if someone fired the gun at a target within seven feet in laboratory conditions. The forensic scientist clarified that there would be some variance from that estimate at the scene.

Jeffries's t-shirt did not have gunshot residue on it. But the forensic scientist did not opine as to how far the gun was from the t-shirt when it was fired, noting that there could have been rough handling of the shirt or an intervening object.

In White's account, he was alone in his car in front of the house when he saw Jeffries approach Pointer, "a little tussle [occurred] and then I heard a gunshot." 8 RP at 792. "There was like a little movement and [Jeffries] moved [Houston-Collazo] out of the way. And I saw a little movement, and I hear[d] gunshots." 8 RP at 792.

More specifically, White saw Jeffries approach Pointer and hit him. White then saw a muzzle flash from Pointer's car and then he saw a couple flashes coming from the alleyway. According to White, Jeffries never carried guns. White believed that Pointer shot Jeffries and Crump then shot at Pointer.[7]

In Pointer's account, after he left Houston-Collazo's house, he came back to get his wallet that he had left in the kitchen. He parked in the back alley because it was closer to the kitchen. Seeing his son's toys on the ground, Pointer loaded the toys by leaning into the rear-driver-side seat. As he leaned into the seat, Pointer saw someone wearing a hoodie approach with something in his hand.

Pointer stepped out of the car and Jeffries "was right there." 11 RP at 1270. Pointer backed up when he saw Jeffries. Jeffries grabbed Pointer, pinned him against the car, and started "swinging" a gun in his hand to pistol-whip[8] Pointer. 11 RP at 1273. Immediately after Jeffries struck Pointer on his head, the "shooting starts, and I start ducking." 11 RP at 1273. Pointer sought cover near the back of his car when he noticed a gun on the ground and picked it up. Pointer heard glass breaking and he fired the gun. Pointer claimed, "I didn't aim at nobody. I wasn't trying to shoot nobody." 11 RP at 1275. Pointer then jumped in his car and drove away amid more gunfire; he did not recall striking anyone with his car. Later, Pointer tossed the gun out of the car window.

---

[7] Crump invoked his Fifth Amendment right against self-incrimination and did not testify.

[8] "Pistol-whip" is defined as "to beat with a pistol." WEBSTER'S THIRD NEW INT'L DICTIONARY 1724 (1993).

### III. JURY INSTRUCTIONS

As part of the self defense instructions, the State asked the trial court to give a first aggressor instruction and Pointer objected. Pointer did not elaborate on the legal basis for his objection.

The trial court gave jury instructions on self-defense, actual danger is not necessary, no duty to retreat, and the following first aggressor instruction:

> No person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self-defense and thereupon kill another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor, and that defendant's acts and conduct provoked or commenced the fight, then self-defense is not available as a defense.

Clerk's Papers (CP) at 25. The no duty to retreat instruction stated,

> It is lawful for a person who is in a place where that person has a right to be and who has reasonable grounds for believing that he is being attacked to stand his ground and defend against such attack by the use of lawful force. The law does not impose a duty to retreat.

CP at 229. The actual danger not necessary instruction stated, "Actual danger is not *necessary* for a homicide to be justifiable." CP at 228 (emphasis added).

The trial court also gave an instruction defining necessary as "under the circumstances as they reasonably appeared to the actor at the time, (1) no reasonably effective alternative to the use of force appeared to exist and (2) the amount of force used was reasonable to effect the lawful purpose intended." CP at 227.

In closing argument, Pointer argued "For Mr. Pointer it happened quickly, and it is life and death. He said I turned around. He's there. He's got me. I can't yell. I can't run." 12 RP at

No. 57268-1-II

1460. The jury convicted Pointer of first degree murder of Jeffries and first degree unlawful possession of a firearm.[9] Pointer appeals.

ANALYSIS

I. SUFFICIENCY OF THE EVIDENCE

When the defendant challenges the sufficiency of the evidence underlying their conviction, we determine whether any rational juror could have found the essential elements of the charged crime beyond a reasonable doubt based on the evidence presented at trial. *State v. Condon*, 182 Wn.2d 307, 314, 343 P.3d 357 (2015). In making this determination, we view the evidence in the light most favorable to the State. *Id*. Additionally, when the defendant makes a sufficiency of the evidence challenge, they admit the truth of the State's evidence. *Id*.

All reasonable inferences from the evidence are drawn in favor of the State and interpreted most strongly against the defendant when challenging the sufficiency of the evidence in a criminal case. *State v. Salinas,* 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Circumstantial and direct evidence are equally reliable. *State v. Notaro*, 161 Wn. App. 654, 671, 255 P.3d 774 (2011). We review de novo sufficiency of the evidence challenges. *State v. Heutink,* 12 Wn. App. 2d 336, 359, 458 P.3d 796 (2020).

"'[S]pecific criminal intent of the accused may be inferred from the conduct where it is plainly indicated as a matter of logical probability.'" *Notaro*, 161 Wn. App. at 671 (quoting *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980)). Relatedly, "[w]e do not infer criminal intent from evidence that is patently equivocal." *State v. Vasquez*, 178 Wn.2d 1, 14, 309 P.3d 318

---

[9] The jury found Pointer not guilty of attempted first-degree murder as to Houston-Collazo.

(2013). We defer to the trier of fact's determinations as to conflicting testimony, witness credibility, and the persuasiveness of the evidence. *Notaro*, 161 Wn. App. at 671.

A.  *Premeditated Intent*

Pointer argues that his first degree murder conviction should be reversed and dismissed because the State failed to prove that he acted with premeditated intent. We disagree.

"A person is guilty of murder in the first degree when: (a) With a premeditated intent to cause the death of another person, he or she causes the death of such person or of a third person." RCW 9A.32.030(1)(a). "'Premeditation' is 'the deliberate formation of and reflection upon the intent to take a human life' and involves 'the mental process of . . . deliberation, reflection, weighing or reasoning for a period of time, however short.'" *Condon*, 182 Wn.2d at 315 (internal quotation marks omitted) (quoting *State v. Pirtle*, 127 Wn.2d 628, 644, 904 P.2d 245 (1995)). Premeditation involves "more than a moment in point of time." RCW 9A.32.020(1).

"Factors relevant to establish premeditation include motive, procurement of a weapon, stealth, and method of killing." *State v. Aguilar*, 176 Wn. App. 264, 273, 308 P.3d 778 (2013). Inflicting multiple wounds or shots supports a premeditation finding. *Notaro*, 161 Wn. App. at 672.

Here, viewing the evidence in the light most favorable to the State, a rational juror could find premeditation beyond a reasonable doubt. As to motive, Jeffries had physically assaulted Pointer earlier in the day in front of Pointer's son, when Pointer had his jaw wired shut and was using a cane to walk. Jeffries also punched Pointer's son during the same incident. Even before the aforementioned incident, Pointer and Jeffries disliked each other. And Pointer had a suspicion that Houston-Collazo was romantically involved with Jeffries, which irritated him.

9

Pointer told Houston-Collazo to bring Jeffries to the townhouse shortly before the murder in a weird tone of voice indicating "nothing bad is going to happen." 4 RP at 242. Pointer admits that this invitation could be probative of his desire to harm Jeffries. Although contrary inferences may also be drawn—like Pointer invited Jeffries for reconciliation—a reasonable inference from the evidence viewed in the light most favorable to the State is that Pointer invited Jeffries to kill him.

As to procurement of a weapon, Pointer did not appear to have a gun on him when he asked Houston-Collazo to bring Jeffries to the townhouse in front of AJ. But Houston-Collazo, as she walked to the back alleyway, saw a gun in Pointer's hand as he exited his car. Moreover, White testified that Jeffries did not carry a gun and MJ did not see Jeffries carrying a gun that evening. A reasonable inference from such evidence, viewed in the light most favorable to the State, is that Pointer procured the gun before arriving in the back alley.

As to stealth, Pointer arrived at Houston-Collazo's house in all black clothing without his phone, which could be used for tracking. Pointer parked in the back alley instead of parking in front of the house as he had earlier in the evening. Additionally, Pointer told Houston-Collazo to bring Jeffries to the house, that he just wanted to talk, and that nothing bad would happen. Thus, reasonable inferences from the evidence viewed in the light most favorable to the State and most strongly against Pointer undermine Pointer's benign theory of returning to the house for his wallet and instead supports the reasonable inference that Pointer returned with malicious intentions toward Jeffries.

As to method of killing, under *Notaro*, the fact that after Pointer shot Jeffries, Pointer then proceeded to run over Jeffries twice with a car, viewed in the light most favorable to the State,

supports a reasonable inference that Pointer acted with premeditation by inflicting multiple wounds on Jeffries.

Pointer argues that the State relied on only patently equivocal evidence to prove premeditation, and so, the jury relied on only speculation to find premeditation. It is true that much of the aforementioned evidence could support different inferences. But viewing the evidence as a whole, drawing all reasonable inferences in the light most favorable to the State, and admitting the truth of the State's evidence, we disagree that the evidence is patently equivocal. Given the evidence presented at trial, a rational juror could find beyond a reasonable doubt that Pointer acted with premeditated intent.

B.      *Self-Defense*

Pointer argues that the State failed to disprove that he acted in self-defense. We disagree.

If the defendant raises some credible evidence that their actions constituted self-defense under the circumstances, the State bears the burden to disprove self-defense beyond a reasonable doubt.[10] *State v. Grott*, 195 Wn.2d 256, 266, 458 P.3d 750 (2020). RCW 9A.16.050 provides that a homicide is justifiable under two circumstances:

> (1) In the lawful defense of the slayer, or his or her husband, wife, parent, child, brother, or sister, or of any other person in his or her presence or company, when there is reasonable ground to apprehend a design on the part of the person slain to commit a felony or to do some great personal injury to the slayer or to any such person, and there is imminent danger of such design being accomplished; or

---

[10] Justifiable homicide is not synonymous with the phrase self-defense. *State v. Moreno*, 26 Wn. App. 2d 681, 693 n.2, 529 P.3d 431 (2023). But a justifiable homicide defense falls under the broader rubric of self-defense. *Id.*

(2) In the actual resistance of an attempt to commit a felony upon the slayer, in his or her presence, or upon or in a dwelling, or other place of abode, in which he or she is.[11]

Our Supreme Court has stated the conceptual distinction between these two circumstances as follows:

RCW 9A.16.050(1) contemplates justifiable homicide where the defendant reasonably fears the person slain is *about to* commit a felony upon the slayer or inflict death or great personal injury, and there is *imminent* danger that the felony or injury will be accomplished. *See* 9A.16.050(1). In contrast, RCW 9A.16.050(2) considers a homicide justifiable where the defendant acted in *actual resistance* against an attempt to commit a felony on the slayer.

*State v. Brightman*, 155 Wn.2d 506, 520-21, 122 P.3d 150 (2005).

To have a valid claim of self-defense, the slayer's use of deadly force must be necessary. *Id*. at 521. "'Necessary' means that no reasonably effective alternative to the use of force appeared to exist and that the amount of force used was reasonable to effect the lawful purpose intended." RCW 9A.16.010(1). When the defendant employs lethal force, the force is only necessary when used to defend against a threat to life or great bodily harm. *Brightman*, 155 Wn.2d at 522. Additionally, if the defendant is the first aggressor and provokes the altercation, the defendant generally cannot invoke self-defense. *Grott*, 195 Wn.2d at 266.

Here, the State presented evidence of Pointer and Jeffries' tumultuous and assaultive relationship. The State presented testimony that earlier in the evening, Jeffries beat up Pointer and punched Pointer's son in the same incident. The State also presented evidence that Pointer

---

[11] RCW 9A.16.050(2) "require[s] the slayer to reasonably fear great personal injury before using deadly force." *State v. Brown*, 21 Wn. App. 2d 541, 564, 506 P.3d 1258, *review denied*, 199 Wn.2d 1029 (2022).

returned to Houston-Collazo's house with the gun, shot Jeffries, and then ran over Jeffries twice. Generally, Jeffries did not carry guns, and Jeffries did not appear to be armed that evening.

Moreover, the State presented evidence that there was some distance between Pointer and Jeffries when Pointer shot him. The State also presented evidence suggesting that the additional gunfire that night likely originated from Crump, that Crump fired at Pointer after Pointer shot Jeffries. Viewing the evidence in the light most favorable to the State, Jeffries was not armed, Pointer was armed with a firearm, and Jefferies was not close to Pointer when Pointer shot Jeffries.

Also, White testified that as Jeffries approached Pointer, "[t]here was like a little movement and [Jeffries] moved [Houston-Collazo] out of the way. And I saw a little movement, and I hear gunshots." 8 RP at 792. Such testimony suggests that Jeffries took protective action as to Houston-Collazo because, as other evidence shows, Pointer was pointing the gun at the time of Houston-Collazo and Jeffries's initial approach and that Pointer fired the gun before other shots were fired.

As shown in the premeditation section of this opinion, the State presented evidence that Pointer had motive, procured a weapon, and employed stealth. And, as discussed above, the State also presented evidence that there was some distance between Pointer and Jeffries and that he ran over Jeffries twice after shooting Jeffries. Pointer maintained that he acted in justifiable self-defense. But, the evidence showed, and the jury found, premeditated murder. Although Pointer had a different version as to what happened, we cannot reweigh the evidence or evaluate the credibility of witnesses. *State v. McCreven*, 170 Wn. App. 444, 477, 284 P.3d 793 (2012).

We hold that the State presented sufficient evidence to prove beyond a reasonable doubt that Pointer did not act in self-defense when he shot Jeffries.

## II. JURY INSTRUCTIONS

A.      *Pointer Failed to Show That the Alleged Error in Giving the First Aggressor Instruction Was an Error of Constitutional Magnitude*

Pointer argues that the trial court erred by giving the first aggressor instruction as it was not supported by the evidence. The State argues that this issue is unpreserved and Pointer failed to show that it warrants review under RAP 2.5(a). We agree with the State.

To preserve a jury instruction challenge for appeal, the appellant must apprise the court of the precise legal reason for the objection. *State v. Salas*, 127 Wn.2d 173, 182, 897 P.2d 1246 (1995). We may refuse to review unpreserved claims of error. RAP 2.5(a). "However, a party may raise the following claimed errors for the first time in the appellate court: . . . (3) manifest error affecting a constitutional right." RAP 2.5(a). The party urging review of the unpreserved error bears the burden of showing that the error is of constitutional magnitude, and if so, that the error is manifest. *Grott*, 195 Wn.2d at 267.

Here, the trial court noted that the self-defense instructions would need to include the first aggressor instruction. Initially, Pointer agreed with the trial court, but later, Pointer objected to the first aggressor instruction. Pointer did not provide a legal reason for the objection. Under *Salas*, this is insufficient to preserve the issue for appeal. As such, Pointer must establish that giving the first aggressor instruction was a manifest error affecting a constitutional right.

We determine on a case-by-case basis whether erroneously given first aggressor instructions are errors affecting a constitutional right. *Grott*, 195 Wn.2d at 268. We consider how

the alleged error compares to other instructional errors, like directing a verdict, improperly shifting the burden of proof, or not requiring a unanimous verdict. *Id*.

On appeal, Pointer asserts that erroneously issuing a first aggressor instruction is of constitutional magnitude because it prevented Pointer from arguing his theory of the case. Pointer does not explain how giving the first aggressor instruction prevented him from arguing his theory of the case, especially when the trial court gave the jury instructions on self-defense and no duty to retreat. He cannot meet his burden with such a passing argument.

B.      *The Instruction Defining "Necessary"*

Pointer also argues that the trial court erred by failing to make clear that there is no duty to retreat when acting in self-defense because the court included an instruction defining "necessary." Br. of Appellant at 57. The State argues that Pointer waived the right to challenge the jury instructions by failing to object below. Assuming without deciding that error occurred, and that the error is of constitutional magnitude, we conclude it was harmless beyond a reasonable doubt.[12]

Pointer argues that it was error to include the instruction defining necessary. Here, Pointer must establish that giving the instruction was a manifest error affecting a constitutional right. RAP 2.5(a), *Grott*, 195 Wn.2d at 267.

Where the instructional error relieves the State of its burden to disprove self-defense, it is a manifest constitutional error. *State v. O'Hara*, 167 Wn.2d 91, 100-02, 217 P.3d 756 (2009). In contrast, failure to define individual terms in the jury instructions does not constitute a manifest

---

[12] Pointer proposed a jury instruction using the word necessary, but did not propose an instruction defining necessary.  Pointer agreed to the instruction defining necessary used by the court.

constitutional error. *Id*. at 103. "If a court determines the claim raises a manifest constitutional error, it may still be subject to a harmless error analysis." *O'Hara*, 167 Wn.2d at 98.

Pointer maintains that this alleged error is of constitutional magnitude because it eliminated the State's burden to disprove self-defense because a juror could view retreat as a reasonable alternative to force.

Jury instructions are sufficient when, read as a whole, they "correctly tell the jury of the applicable law, not be misleading, and permit the defendant to present his theory of the case." *Id*. at 105. In determining the legal sufficiency of the jury instructions, we engage in de novo review. *Heutink*, 12 Wn. App. 2d at 348.

We note that there is a presumption that the jury follows the court's instructions. *State v. Sutton*, 18 Wn. App. 38, 44, 489 P.3d 268 (2021). Misstating the law of self-defense is a constitutional error that we presume is prejudicial. *State v. Walden*, 131 Wn.2d 469, 473, 932 P.2d 1237 (1997). When the instructions are inconsistent, our duty is to determine if the inconsistent instructions misled the jury about its function and duties under the law. *Id*. at 478.

Assuming without deciding that the trial court erred when it issued the instruction defining necessary, such error was harmless beyond a reasonable doubt. The State bears the burden to show the error was harmless beyond a reasonable doubt, which is shown only when the error "'in no way affected the final outcome of the case.'" *Id*. (quoting *State v. Wanrow*, 88 Wn.2d 221, 237, 559 P.2d 548 (1977)).

Here, there was overwhelming evidence that Pointer engaged in the premeditated murder of Jeffries, as discussed above. Pointer argues that the "necessary" instruction "could easily mislead jurors into disregarding the 'no duty to retreat' instruction." Br. of Appellant at 61. But

we disagree that the instruction would mislead the jurors in such a manner. We presume that the jury follows the court's instructions. *Sutton*, 18 Wn. App. at 44. The trial court gave an instruction that stated, "It also is your duty to accept the law from my instructions. . . . The law is contained in my instructions to you. . . . [The instructions] are all important." CP at 198-200. And the trial court expressly instructed the jury that "[t]he law does not impose a duty to retreat." CP at 229. Given the trial court's instructions to the jury as a whole, including the no duty to retreat instruction, a reasonable juror would not have been misled to disregard the no duty to retreat instruction.

Additionally, under the entirety of the jury instructions, Pointer was able to argue his theory of the case that shooting Jeffries was justifiable self-defense because he could not retreat: "it happened quickly, and it is life and death. He said I turned around. He's there. He's got me. I can't yell. I can't run." 12 RP at 1460. Under these circumstances, we conclude that any instructional error was harmless beyond a reasonable doubt.

## III. STATEMENT OF ADDITIONAL GROUNDS

A. *Failure to Issue Certain Jury Instructions*

Pointer argues that the trial court erred in not sua sponte giving (1) an instruction that words alone could not make the defendant the first aggressor and (2) a revived self-defense instruction.

"Jury instructions are sufficient if they are supported by substantial evidence, allow the parties to argue their theories of the case, and when read as a whole properly inform the jury of the applicable law." *State v. Clausing*, 147 Wn.2d 620, 626, 56 P.3d 550 (2002). We view the evidence in the light most favorable to the requester when determining if a party is entitled to a

17

jury instruction—whether such an instruction is supported by substantial evidence. *State v. Fleeks*, 25 Wn. App. 2d 341, 352, 523 P.3d 220 (2023), *review denied*, 1 Wn.3d 1014 (2023).

i. *Words Alone Not Adequate Provocation for Defendant to Be Aggressor Instruction*

Pointer did not request an instruction specifying that words alone cannot make him the first aggressor. Thus, Pointer cannot raise this issue on appeal unless he shows that the lack of the instruction constitutes a "manifest error affecting a constitutional right." RAP 2.5(a)(3). Pointer does not address this burden and, therefore, fails to show he is entitled to review of this unpreserved issue.

ii. *Revived Self-Defense Instruction*

Pointer did not request a revived self-defense instruction below. Thus, Pointer cannot raise this issue on appeal unless he shows that the lack of the instruction constitutes a "manifest error affecting a constitutional right." RAP 2.5(a)(3). Pointer does not address this burden and, therefore, fails to show he is entitled to review of this unpreserved issue.

B.      *Ineffective Assistance of Counsel*

Lastly, Pointer argues that he received ineffective assistance of counsel because his counsel failed to request a "revived" self-defense jury instruction. SAG at 2. We disagree.

To establish ineffective assistance of counsel, the defendant must show their counsel deficiently performed and that such performance prejudiced them. *Fleeks*, 25 Wn. App. 2d at 351. To show deficient performance, the defendant must show their counsel performed below the objective standard of reasonableness. *Id*. We presume counsel performed effectively. *Id* at 352. To overcome that presumption, the defendant must show counsel lacked a legitimate strategic or tactical reason for the challenged conduct. *Id*.

If the defendant is the first aggressor, their right to self-defense may be revived when they withdraw "from the combat at such a time and in such a manner as to have clearly apprised his adversary that he in good faith was desisting, or intended to desist, from further aggressive action." *Id*. at 353 (quoting *State v. Craig*, 82 Wn.2d 777, 783, 514 P.2d 151 (1973)). If a reasonable juror could find that the defendant withdrew from the confrontation, a revived self-defense instruction would have been justified. *State v. Dennison*, 115 Wn.2d 609, 613, 801 P.2d 193 (1990).

At trial, Pointer testified that Jeffries attacked him with a pistol. In closing, Pointer emphasized that he could not escape, run away, or yell. Pointer's theory is not predicated on Pointer being the first aggressor, but the opposite. In light of the testimony, Pointer's counsel reasonably relied on the self-defense theory—not revived self-defense. Therefore, we hold that Pointer's counsel was not deficient for not requesting a revived self-defense instruction and not doing so was consistent with the defense strategy.

No. 57268-1-II

CONCLUSION

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Che, J.

We concur:

Lee, J.

Cruser, C.J.